## ARIZONA EMPLOYERS' LIABILITY CASES.[1]

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF ARIZONA AND TO THE SUPREME
COURT OF THE STATE OF ARIZONA.

Nos. 20, 21, 232, 332, 334.—Argued January 25, 28, 1918; April 24, 25,
1919.—Decided June 9, 1919.

The Arizona Employers' Liability Law (Rev. Stats., 1913, pars. 3154,
3156, 3158, 3160,) in respect of certain specified employments rea-
sonably designated as inherently hazardous and dangerous to work-
men, imposes upon the employer, without regard to his fault or that
of any person for whose conduct he is responsible, liability in com-
pensatory (not speculative or punitive) damages for the accidental
personal injury or death of any employee arising out of and in the
course of the employment and due to a condition or conditions of
the occupation, but not caused by the employee's own negligence.
*Held*, that it does not infringe the rights of employers under the
Fourteenth Amendment. Pp. 419, *et seq. New York Central R. R.
Co.* v. *White*, 243 U. S. 188.

The States are left a wide field of discretion to change their laws, and
their legislation is not subject to constitutional objection upon the
ground that it is novel and unwise. Pp. 419–421.

The court has repeatedly adjudged that the rules governing the liability
of employers for death or injury of employees in the course of the
employment are subject, as rules of future conduct, to alteration by
the States and that, excluding unreasonable or arbitrary changes,
the employer may be made liable without fault and the common-
law defenses be abolished. P. 419.

In this instance, the effect of the statute is to require the employer
instead of the employee to assume a pecuniary risk inherent in the

---

[1] The docket titles of these cases are: *Arizona Copper Company,
Limited,* v. *Hammer*, No. 20, *Arizona Copper Company, Limited,* v.
*Bray*, No. 21, *Ray Consolidated Copper Company* v. *Veazey*, No. 232,
in error to the District Court of the United States for the District of
Arizona; *Inspiration Consolidated Copper Company* v. *Mendez*, No. 332,
*Superior & Pittsburg Copper Company* v. *Tomich, sometimes known as
Thomas,* No. 334, in error to the Supreme Court of the State of Arizona.

employment, and due to its conditions and not to the negligence of the employee killed or injured, leaving the employer, as the common law in theory left the employee, to take such risk into consideration in fixing wages, with the opportunity, besides, to charge the loss as a part of the cost of the product of the industry. P. 420.

The statute limits recovery strictly to compensatory damages—excluding punitive damages, which it may be conceded would be contrary to natural justice—and makes only such discrimination between employer and employee as necessarily arises from their different relations to the common undertaking. There is no denial of the equal protection of the laws. P. 422.

The statute adds no new burden to the cost of industry, but merely recognizes and in part transfers to the employer an existing and inevitable burden due to the hazardous nature of the industry. P. 424.

The statute may be regarded as a police regulation, designed to prevent the injured employees and their dependents from becoming a burden upon the public; and, so regarded, it can not be said to be so clearly unreasonable and arbitrary that this court should declare it violative of the Fourteenth Amendment. *Id.*

It amounts to a contradiction of terms to say that, in leaving the issues of fact and the compensatory damages to be determined by juries according to the established procedure of the courts, the statute violates due process of law. P. 426.

If a State establishes a right of action for compensation to injured workmen upon grounds not arbitrary or fundamentally unjust, the question whether the award shall be measured as compensatory damages are measured at common law, or according to some prescribed scale reasonably adapted to produce a fair result, is for the State to determine. P. 428.

Whether such compensation should be paid in a single sum or distributed during the period of disability or need, is likewise for the State to determine. P. 429.

The objection that the Arizona act may be extended by construction to non-hazardous industries can not be raised by parties whose industries were indisputably hazardous. *Id.*

The objection that the benefits of the act may be extended, in the case of a death claim, to those not nearly related to or dependent upon the workman, or may even go by escheat to the State, *held,* not presented, the Arizona court having construed the act as confining recovery to compensatory damages. P. 430.

The Arizona system allows the injured employee an election of remedies,
    permitting restricted recovery under a "compensation law" although
    he has been guilty of contributory negligence, and full compensatory
    damages under the Employers' Liability Act if he has not. *Held*,
    not inconsistent with the due process or equal protection clauses,
    as respects employers. P. 430.

CONCURRING OPINION OF HOLMES, J.:—

That certain voluntary conduct may constitutionally be put at the
    peril of those pursuing it finds illustrations in the criminal law and
    in the extent to which a master may be held for acts of a servant.
    P. 432.

The criterion of fault itself involves applying the external standard of
    prudence, and the decision of a jury. *Id.*

Holding the employer liable for accidents tends directly to secure atten-
    tion to the safety of the men,—an unquestionably constitutional
    object of legislation. *Id.*

In allowing damages for pain and mutilation, the Arizona law con-
    stitutionally may have been based on the view that, if a business
    is unsuccessful it means that the public does not care enough for it
    to make it pay, and, if it is successful, the public pays the ex-
    penses, and something more, and should pay, as part of the cost
    of producing what it wants, the cost of pain and mutilation inci-
    dent to the production; and that, by throwing that loss upon the
    employer in the first instance, it is thrown in the long run, justly,
    upon the public. P. 433.

The liability under this law is limited to a conscientious valuation of the
    loss, and it is to be presumed that juries and courts will confine it
    accordingly. *Id.*

It is not urged, in this case, that the provision for 12 per cent. interest
    from the date of suit, in case of an unsuccessful appeal, is void.
    P. 434.

19 Arizona, 151; *id.* 182, affirmed.

THE cases are stated in the opinion.


*Mr. Ernest W. Lewis* and *Mr. John A. Garver*, with whom
*Mr. W. C. McFarland* was on the briefs, for plaintiff in
error in Nos. 20, 21:

In reaching the conclusion that the workmen's com-

pensation acts of New York, Iowa and Washington were a valid exercise of legislative power, this court was influenced by two considerations: one, involving a legal principle, that in taking away the common-law defenses, or some of them, from the employer, the legislature had substituted a substantial equivalent, in limiting the liability of the employer according to a prescribed and reasonable schedule, which would probably not be any more onerous upon him than his common-law liability; and the other, involving social and economic considerations, that the legislation was a valid exercise of the police power, in promoting the general welfare. *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 203; *Hawkins* v. *Bleakly,* 243 U. S. 210; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 234.

The justification for legislation of this kind is that, in the interest of society, hazardous occupations should themselves be charged with the reasonable burden of sustaining the inevitable loss resulting from the inherent risks of the business, which no ordinary care or foresight can guard against, and that a liability or insurance fund should be created by a tax upon the business, which, on the one hand, will afford substantial and speedy compensation to the injured employee, and prevent his becoming an object of charity, and, on the other hand, will protect the employer from uncertain and possibly ruinous verdicts that might bankrupt the business, to the injury, not only of the particular employer and of all other workmen employed by him, but of society generally. The fund is in the nature of an insurance against the joint risk in which the parties embark. The liability of the employer is defined and regulated according to the injuries sustained, and the right of the employee to receive, without delay, the entire compensation thus fixed, is established. Both employer and workman are directly benefited, and the State is relieved from caring for many

unfortunates who might otherwise become dependent upon it.

But legislation of this kind, as this court pointed out, must be reasonable to the employer as well as to the employed. It promotes the general welfare only in so far as it relieves society from the ills of the existing system. One of the greatest of those ills was the heavy burden of litigation which the old system fostered, with long deferred and scant, if any, benefits to the person sustaining the injuries, with great expense both to the State and to the employer, and with an uncertain liability thrown upon the employer, against which he could protect himself only by insurance in companies whose principal business consisted in combating all claims for injuries.

The Arizona legislature completely failed to apply either of the principles referred to by this court. The employer is deprived of his common-law defenses and is given nothing in return, because the workman is left free to reject the compensation provided by the Workmen's Compensation Law. The statute will cause direct injury to society at large; for unlimited liability without fault will necessarily act as an effectual deterrent to the investment of capital in industries declared to be hazardous. Men of small means might be ruined by a single verdict; and large corporations would be in constant danger from excessive verdicts, as is obvious from the verdicts in these cases.

The Liability Law leaves a workman, whose injury is due solely to his own negligence, the right to demand compensation under the Workmen's Compensation Law. Thus, in the only instance in which an employer could interpose a complete defense under the Liability Law, he is obliged to make compensation under the Compensation Law.

A further peculiar consequence of this Liability Law is that, if the employer pleads that the negligence of the

workman contributed to the injury, he is thereby prevented from claiming that he himself was not guilty of negligence, *Superior & Pittsburg Copper Co.* v. *Tomich*, 19 Arizona, 182; and if the employer is actually guilty of some negligence, he gets off more lightly than if he is entirely free from fault, because, in the former case, the liability will be apportioned between the employer and employee in proportion to their negligence. See dissenting opinion of Ross, J., in *Superior & Pittsburg Copper Co.* v. *Tomich, supra.*

A further peculiar feature of this Liability Law is that there may be a recovery in the case of death, even where there is no one in existence who was in any way dependent upon the decedent, and even though his next of kin may be enemies of the State and Nation, or even though he may have no ascertainable next of kin. Workmen's compensation laws should limit the benefits to the injured person or those actually dependent upon him; and this principle has been universally recognized in this and other countries.

No other State, so far as we have been able to ascertain, has ever gone to the extreme extent shown in this Arizona legislation, of subjecting employers to unlimited liability without any fault on their part, or without any compensating obligation on the part of the workmen. The Arizona Workmen's Compensation Law is a mere farce, so far as any protection to the employer is concerned; and it is resorted to by the workman only when his own conduct has effectually barred his recovery in an action at law.

There are certain cases in which the courts have recognized that there may be liability without fault; but they are exceptions to the general rule of liability under our law and depend on conditions which are in no way applicable to this situation. Some of them are based on the ancient insurer's liability of innkeepers and carriers, while others relate to the strict liability which has been

imposed on railroads in relation to damages caused by
fire or by injuries to cattle. The latter are really not
cases of liability without fault, as the liability is usually
imposed only where there has been a failure to comply
with some reasonable requirement, such as fencing the
railroad's right of way. This is simply an instance of the
power of the legislature to create a new obligation, failure
to observe which is a sufficient wrong to be the basis of
liability.

*Mr. Frank E. Curley* and *Mr. L. Kearney*, with whom
*Mr. Frank H. Hereford* was on the briefs, for defendants
in error in Nos. 20, 21.

*Mr. William H. King*, with whom *Mr. Alexander Britton*, *Mr. Evans Browne* and *Mr. F. W. Clements* were on
the brief, for plaintiff in error in No. 232:

In *New York Central R. R. Co.* v. *White*, 243 U. S. 188,
201, this court considered the New York Workmen's
Compensation Act, and specifically held that it was a
substituted system, devised to compensate employees or
their dependents for injuries received in certain hazardous occupations, the measure of damages being based
upon the loss of earning power, having regard to the previous wage and the character and duration of disability,
and in case of death, benefits according to the dependency of the surviving wife, husband, etc.

The Employers' Liability Law of Arizona does not relieve
"the employer from responsibility for damages, measured
by common-law standards." It does not "require him to
contribute a reasonable amount, according to a reasonable and definite scale, by way of compensation for loss
of earning power." It is not a substituted system, assuring the employee "a definite and easily ascertained compensation," and the employee is not required to assume
"any loss beyond the prescribed scale."

It abuses the recognized power of "the State to impose upon the employer the absolute duty of making a moderate and definite compensation in money to every disabled employee . . . in lieu of the common-law liability confined to cases of negligence," by permitting a recovery of an unlimited amount, not for disability alone, as in the *White Case*, but for physical suffering also. It is not a composition of losses sustained in a mutual joint adventure (as Justice Pitney reasons), in which accidental injury is inevitable and is expected, but it places all of the loss, without limitation, upon one of the "co-adventurers," to-wit, the employer.

It not only practically deprives the employer of all of the defenses known to the common law, but takes from him the right to defend by showing that he was guilty of no fault. In other words, the legislation is all in favor of the employee, and the employer is given no chance to escape the unlimited liability imposed. When action is commenced under this act, the employer has no alternative. He cannot relegate the employee to any other act or mode of procedure, except the one which the employee himself has selected. And when damages have been imposed in pursuance of the provisions of this law, under the conditions before stated the employer is deprived of his property without due process of law, and denied the equal protection of the law.

No counsel appeared for defendant in error in No. 232.

*Mr. Edward W. Rice*, by leave of court, filed a brief as *amicus curiæ* in No. 232.

*Mr. Edward W. Rice*, with whom *Mr. Harvey M. Friend* was on the brief, for plaintiff in error in No. 332:

This law is in no sense a regulation of dangerous employments. No new duty is imposed upon the employer

and he is subjected to no liability for failure to discharge his duties, new or old. The law merely imposes a new pecuniary liability for injuries that cannot be foreseen or prevented by any degree of care. This cannot increase the care of the employer or protect the employee from injury. It merely seeks to impose a new liability on employers. It is devoid of all of the features that characterize measures which seek to attain social justice by regulating in the interest of the public the private relation of master and servant out of which losses from industrial accidents are bound to arise. Our conclusion is that this is merely a labor law confined to the rights and liabilities of the employee and employer and not a police measure in which the public has an interest. Consequently the question of its validity should be determined by the principles which govern laws affecting private rights as distinguished from those by which police measures enacted primarily to safeguard the public are to be tested. This court, throughout its career, has recognized how firmly the fabric of free government rests upon the inviolability of private right. The preservation of individual liberty and the protection of private property and of the right of private contract are essential to all free government. *Fletcher* v. *Peck*, 6 Cranch, 87, 135; *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago*, 166 U. S. 226, 237; *Citizens' Savings & Loan Association* v. *Topeka*, 20 Wall. 663, 665; *Holden* v. *Hardy*, 169 U. S. 366, 389; *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 202.

From the fact that private right must be subordinated to the public welfare, it does not follow that in those cases where the public welfare does not require the surrender of private right the legislature, merely as between individuals, may make arbitrary distribution of private losses. *Lochner* v. *New York*, 198 U. S. 45, 56. In the case of a mere labor law the slightest exaction would be beyond the legislative power. *Mountain Timber Co.* v. *Wash-*

*ington*, 243 U. S. 219, 240.   The law of negligence is founded upon reason.   It is reasonable that an individual should refrain from causing injury to another by his negligence, and that he should make recompense for injury so caused, but it is self-evident that the establishment of a rule of unlimited liability without fault as the governing rule of individual responsibility would merely substitute for the old natural law of non-liability a new tyranny of irresponsible and arbitrary power.   This is precisely what the Arizona law attempts to do.

The obligation of the individual to respond in damages for negligence and his right to immunity from liability when not at fault are thus among those obligations and rights that inhere in free government.   It is because of their fundamental character that they have persisted throughout our legal history.   Changes have been made from time to time in the administration of the law of negligence, as in the defenses available to relieve one charged with negligence, and in the extent of the duties assumed or imposed, the breach of which shall constitute negligence, and in the rules of evidence in such cases, but the individualistic basis of liability for personal injury, and its converse of immunity from responsibility in the absence of negligence, as rules of individual liability, have remained unchanged in their broad outlines.   Nothing inherent in free government or natural justice requires that one charged with negligence should be allowed to urge the defenses of assumption of risk, contributory negligence or fellow-servant, or that the conception of duties, the breach of which constitute negligence, should not develop with the unfolding industrial life of the people. Therefore, as this court has repeatedly declared, these defenses may be modified or entirely abrogated and new duties may be created.

The distinction is both clear and fundamental between the proposition that, regardless of these defenses, an

employer shall be liable in damages for his negligence, either personal or properly imputed to him, and the further proposition that he shall be liable as for negligence when he is in no sense at fault. Under the first proposition the question of negligence still remains, and on this fundamental question the defendant has the right to defend. Under the second proposition, liability is practically prejudged. If the right to defend cannot thus be taken away indirectly by a conclusive presumption of negligence, *Mobile, Jackson &c. R. R. Co.* v. *Turnipseed,* 219 U. S. 35, 43, it cannot be taken away directly by a departure from the principle of negligence as the basis of individual liability for injury. *Middleton* v. *Texas Power & Light Co.,* 108 Texas, 96, 107. There are certain instances of liability which are sometimes cited as examples of liability without fault. *Chicago, Rock Island & Pacific Ry. Co.* v. *Zernecke,* 183 U. S. 582, 586; *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 204. But when analyzed they will be found to furnish no substantial basis in reason or in law for the support of legislation such as that presented in this case. By the ancient law of deodands, the property of a man wholly innocent of wrong was confiscated by the Crown under the false cloak of religion. In admiralty, the ship itself is treated as a wrongdoer, but is only answerable for the wrong of those in charge of her. The maxim of agency "*qui facit per alium facit per se,*" which is the real foundation of the husband's liability as well as that of the master, involves imputed fault in cases where the relation of the parties furnishes some foundation in justice for the imposition of liability. The fault is there, but it may not be the personal fault of the person charged with responsibility for it. The common-law liability of the carrier and of the innkeeper, of course, did not arise out of a mere personal relation. Both pursue a public calling, one charged with a public interest, and therefore peculiarly subject to regu-

lation in the interest of the public.  It was never the law, so far as we know, that private carriers or private boarding-house keepers, who are free to serve whom they will, under such contracts as they may please to make, were liable as insurers to their patrons or guests.  The analogy between the responsibility for dangerous agencies and liability for inevitable accidents in industry as between the joint adventurers pursuing such industry for their mutual profit is so remote as to furnish no real aid in the solution of the present problem.

Statutes requiring railroad companies to fence their rights of way and upon their failure to do so imposing upon them liability for stock killed have been upheld. In such cases the liability is for breach of duty validly imposed, *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis*, 165 U. S. 150, 158; in short, a liability for negligence.  Black, Constitutional Law, 2d ed., p. 351.  Laws imposing liability for stock killed without requiring the right of way to be fenced, on the other hand, create a liability without fault.  Such laws have been universally condemned.

It is indeed significant that in the whole legal history of individual liability there has been such a consistent aversion to the establishment of a liability without fault.  It cannot be accounted for upon any other theory than that the principle itself is repugnant to the fundamental rights of liberty and property on which our institutions are founded.  This rule of individual liability is one of the rules which the legislature is "prevented by constitutional limitations" from changing at its whim.  *Munn* v. *Illinois*, 94 U. S. 113.  It seems plain, therefore, that this law is a mere labor law, concerned only with the rights of individuals, and that as such it is clearly void.

The police power of the State is not without limitation. *Lawton* v. *Steele*, 152 U. S. 133, 137.  The first inquiry here is whether the law deals with a subject-matter of public as distinguished from private concern; the second is

whether the measure is reasonably necessary and appropriate to achieve the public end sought. *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 238; *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 207. Not every law that deals with a proper subject-matter of police regulation is to be construed as a police measure or is to be held valid as such. *Lochner* v. *New York,* 198 U. S. 45, 57.

The compensation systems considered by this court in the *White, Hawkins* and *Mountain Timber Company Cases,* regulate in a most thoroughgoing manner and in the interest of the public the whole subject-matter of compensation for industrial injury and death. The Arizona law has nothing in common with these laws. It does not regulate anything. As aptly remarked by Justice Ross in his dissent in this case, "Ours is not a system but a lawsuit."

It seems to us that the Arizona law is in no sense a police measure. However, if we treat it as such simply because it deals with a subject which may be regulated in the interest of the public, it follows from what the court has said (*New York Central R. R. Co.* v. *White,* 243 U. S. 188, 206), that it must be set aside as invalid unless it can be supported as an appropriate and proper exercise of the police power.

The extent of the public interest must mark the extreme limit of permissible interference with the private rights of the parties. The regulation of the relation of master and servant and of the compensation to be paid the servant in case of injury are conceivably matters of public concern, for the reason that, if the burden of injury losses is to fall on the workman, the injured man and his dependents are certain, in a considerable number of instances, to be pauperized and to be driven into vice and crime. *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 207. The public is concerned, in the first place, with

the method by which compensation is secured, to the end that it shall be fairly estimated and promptly paid, without burdensome expenses and friction between employer and employee.  In the second place, the public is concerned with the amount of compensation so that the award shall be sufficient to protect the workman and his dependents against poverty and its attendant evils.  This two-fold interest of the public must find appropriate expression in any law which can be sustained as a police regulation.

The first can be achieved only by abolishing litigation and establishing a just system of compensation.  In the second place, as it is a matter of public concern that the award shall be sufficient to prevent pauperism and its evils, it is of equal concern that the award shall not exceed what is reasonably necessary to protect the workman and his dependents in these respects.

The physical hurt must be borne by the injured person; it cannot be shifted.  *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 203.  Neither can the physical hurt be measured in terms of money.  A law which authorizes an award of damages for pain and suffering and kindred elements does not serve the public interest.  It does, however, open wide the door for speculative verdicts, which bear no true relation to the public interest or to the pecuniary loss sustained by the injured man.  Neither can there be any suggestion of public concern in saddling upon the industry, or upon a particular employer, an unlimited liability to the estate of a deceased workman who has left no one dependent upon his labors, and therefore no one who has suffered pecuniary loss by his death.

This court, in the compensation cases, has expressly refrained from specifying the legal limits of permissible compensation under compensation laws.  Nevertheless, the decisions make it clear that compensation must be based upon earnings, and cannot be allowed for specula-

tive elements such as are included in the damages awarded under the Arizona law. It is equally manifest from these decisions that the rate of compensation must be certain or ascertainable on some definite basis and that it must be limited in amount. These restrictions follow logically from the court's conception of the compensation system as disregarding the immediate cause of the accident and as treating the employment itself for which employer and employee are jointly responsible as the true cause of the injury.

The Arizona law is as inconsistent with this conception as is the common law. It relieves the employer of none of the evils of the common law, but saddles upon him a new lawsuit for damages according to common-law standards, where he has exercised the utmost human care, and, in addition, penalizes him 12 per cent. of the jury's award if he fails on appeal.

*Mr. Graham Foster,* for defendant in error in No. 332, submitted. *Mr. Hugh M. Foster* and *Mr. George F. Senner* were on the brief.

*Mr. Cleon T. Knapp,* for plaintiff in error in No. 334, submitted:

If there is any justification for the enactment of such a law it must be found in the police power. This court has repeatedly recognized the difficulty of exactly defining that power. It is generally recognized as the right of a State to legislate for its general welfare and betterment. The extent to which it may be exercised is dependent largely upon industrial and social conditions. Each exercise must be measured of itself. *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Camfield* v. *United States,* 167 U. S. 518.

The police power cannot be used in an arbitrary manner, calculated to deprive one of private rights. While it

"extends to all great public needs" those same public needs place a limitation upon its valid exercise. The rule of reason must be applied. *Hurtado* v. *California*, 110 U. S. 516; *Hayes* v. *Missouri*, 120 U. S. 68; *Missouri Pacific Ry. Co.* v. *Mackey*, 127 U. S. 205; *Hallinger* v. *Davis*, 146 U. S. 314; *Holden* v. *Hardy*, 169 U. S. 366; *Barbier* v. *Connolly*, 113 U. S. 27. The power cannot be used as an excuse for unjust and oppressive legislation. *Davidson* v. *New Orleans*, 96 U. S. 97; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

The question presented then is whether this law is calculated to benefit the public needs. And the test to be applied is not the mere wording, but whether in practice it would actually accomplish an object beneficial to the health, safety and general welfare. *Lochner* v. *New York*, 198 U. S. 45.

The Arizona Employers' Liability Law is in no way designed to benefit either the health, safety or general welfare. If it were designed to benefit the health and safety of employees it would be beneficial to public welfare. But it is not. If it removed existing ills in present social, industrial, or economic conditions in Arizona, it might, under certain circumstances, be beneficial to public welfare. But it does not. It adds to existing ills.

If any justification can be found for the law, it must be upon reasons supporting the legality of compulsory compensation acts. And it is solely upon such grounds that the Arizona Supreme Court attempted to justify its legality.

We assume that the decisions of this court in the *White*, *Hawkins*, and *Mountain Timber Company Cases* cover the field of justification for enactment of compensation laws. And if there is justification for this law, it must be found in the reasons there given. The decisions in those cases are influenced by the consideration that the legislature in the enactment of those laws substituted a substantial

equivalent. Our quarrel with the Arizona law is not so much that it abrogates the common-law rules of liability as that it absolutely fails to set up something adequate in their stead. It cannot be justified upon any of the grounds supporting the legality of compensation acts. It is not a "method of compensation." It is a suit for damages. It preserves the jury system of awarding damages in an unlimited amount, and should the employer be presumptuous enough to appeal, he is what might be called fined, by being assessed interest on the judgment at 12 per cent. The New York law was not pronounced arbitrary and unreasonable, for the reason that the compensation was moderate and definite. Under this law, judged by its history, the awards will never be moderate and never definite. It provides for damages not alone for loss of earning power, but for pain, suffering, mental and physical anguish, and humiliation, and the jury is quick to consider all such elements.

No evil attendant upon the old personal injury litigation has been removed. The law's delay, the court expense, the large attorney fee, the oft-times miscarriage of justice by inadequate verdicts, and more often by excessive verdicts, the bitterness growing from litigation; all these and many more are still attendant upon the trail of this law. Every reason prompting the enactment of compensation laws is lacking to support it. It is not designed in the remotest way to protect health, safety or public welfare. It is not a valid exercise of police power. The Arizona Supreme Court vainly searched for authorities to justify the constitutionality of the law, and was forced to base its decision entirely upon the reasons given in the *White Case* upholding the New York Compensation Law.

*Mr. Samuel Herrick*, for defendant in error in No. 334, submitted.

MR. JUSTICE PITNEY delivered the opinion of the court.

In each of these cases, a workman in a hazardous industry in the State of Arizona, having received in the course of his employment a personal injury through an accident due to a condition or conditions of the occupation, not caused by his own negligence or so far as appears by that of his employer or others, brought action under the Employers' Liability Law of Arizona, and recovered compensatory damages against the employer ascertained upon a consideration of the nature, extent, and disabling effects of the injury in each particular case.   And the question is raised whether the statute referred to, as applied to the facts of these cases, is repugnant to that provision of the Fourteenth Amendment which declares that no State shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

Art. XVIII of the constitution of the State of Arizona is entitled "Labor," and contains, among others, the following sections:

"SECTION 4. The common law doctrine of fellow servants, so far as it affects the liability of a master for injuries to his servants resulting from the acts or omissions of any other servant or servants of the common master is forever abrogated.

"SECTION 5. The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury.

"SECTION 6. The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

"SECTION 7. To protect the safety of employees in all hazardous occupations, in mining, smelting, manufacturing, railroad or street railway transportation, or any other industry the Legislature shall enact an Employers' Lia-

bility law, by the terms of which any employer, whether individual, association, or corporation shall be liable for the death or injury, caused by any accident due to a condition or conditions of such occupation, of any employee in the service of such employer in such hazardous occupation, in all cases in which such death or injury of such employee shall not have been caused by the negligence of the employee killed or injured.

"SECTION 8. The Legislature shall enact a Workmen's Compulsory Compensation law applicable to workmen engaged in manual or mechanical labor in such employments as the Legislature may determine to be especially dangerous, by which compulsory compensation shall be required to be paid to any such workman by his employer, if in the course of such employment personal injury to any such workmen from any accident arising out of, and in the course of, such employment is caused in whole, or in part, or is contributed to, by a necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof, or by failure of such employer, or any of his or its officers, agents, or employee, or employees, to exercise due care, or to comply with any [law?] affecting such employment; Provided, that it shall be optional with said employee to settle for such compensation, or retain the right to sue said employer as provided by this Constitution."

Pursuant to § 7 the Employers' Liability Law was enacted (c. 89, Laws 1912, Reg. Sess.; Arizona Rev. Stats. 1913, pars. 3153–3162); pursuant to § 8 a Workmen's Compulsory Compensation Law was enacted (c. 14, Laws 1912, 1st Spec. Sess.; Arizona Rev. Stats. 1913, pars. 3163, et seq.).

In two of the present cases the former law was sustained by the Supreme Court of Arizona against attacks based upon the Fourteenth Amendment. *Inspiration Consolidated Copper Co.* v. *Mendez.* 19 Arizona, 151; *Superior &*

*Pittsburg Copper Co.* v. *Tomich,* 19 Arizona, 182. In the three other cases it was sustained by the United States District Court for that District. And the resulting judgments in favor of the injured workmen are brought under our review by writs of error.

Some of the arguments submitted to us assail the wisdom and policy of the act because of its novelty, because of its one-sided effect in depriving the employer of defenses while giving him (as is said) nothing in return, leaving the damages unlimited, and giving to the employee the option of several remedies; as tending not to obviate but to promote litigation; and as pregnant with danger to the industries of the State. With such considerations this court can not concern itself. Novelty is not a constitutional objection, since under constitutional forms of government each State may have a legislative body endowed with authority to change the law. In what respects it shall be changed, and to what extent, is in the main confided to the several States; and it is to be presumed that their legislatures, being chosen by the people, understand and correctly appreciate their needs. The States are left with a wide range of legislative discretion, notwithstanding the provisions of the Fourteenth Amendment; and their conclusions respecting the wisdom of their legislative acts are not reviewable by the courts.

We have been called upon recently to deal with various forms of workmen's compensation and employers' liability statutes. *Second Employers' Liability Cases,* 223 U. S. 1, 47–53; *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 196, *et seq.; Hawkins* v. *Bleakly,* 243 U. S. 210; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152. These decisions have established the propositions that the rules of law concerning the employer's responsibility for personal injury or death of an employee arising in the course of the employment are not beyond alteration by legislation in

the public interest; that no person has a vested right entitling him to have these any more than other rules of law remain unchanged for his benefit; and that, if we exclude arbitrary and unreasonable changes, liability may be imposed upon the employer without fault, and the rules respecting his responsibility to one employee for the negligence of another and respecting contributory negligence and assumption of risk are subject to legislative change.

The principal contention is that the Arizona Employers' Liability Law deprives the employer of property without due process of law, and denies to him the equal protection of the laws, because it imposes a liability without fault, and, as is said, without equivalent protection. The statute, in respect of certain specified employments designated as inherently hazardous and dangerous to workmen— and reasonably so described—imposes upon the employer, without regard to the question of his fault or that of any person for whose conduct he is responsible, a liability in compensatory damages—excluding all such as are speculative or punitive (*Arizona Copper Co.* v. *Burciaga,* 177 Pac. Rep. 29)—for accidental personal injury or death of an employee arising out of and in the course of the employment and due to a condition or conditions of the occupation, in cases where such injury or death of the employee shall not have been caused by his own negligence. This is the substance of pars. 3154 and 3158, and they are to be read in connection with par. 3156, which declares what occupations are hazardous within the meaning of the law. By par. 3160, contracts and regulations exempting the employer from liability are declared to be void.

In effect, the statute requires the employer, instead of the employee, to assume the pecuniary risk of injury or death of the employee attributable to hazards inherent in the employment and due to its conditions and not to the negligence of the employee killed or injured. In deter-

mining whether this departure from the previous rule is so arbitrary or inconsistent with the fundamental rights of the employer as to render the law repugnant to the Fourteenth Amendment, it is to be borne in mind that the matter of the assumption of the risks of employment and the consequences to flow therefrom has been regulated time out of mind by the common law, with occasional statutory modifications. The rule existing in the absence of statute, as usually enunciated, is that all consequences of risks inherent in the occupation and normally incident to it are assumed by the employee and afford no ground of action by him or those claiming under him, in the absence of negligence by the employer; and even risks arising from or increased by the failure of the employer to take the care that he ought to take for the employee's safety are assumed by the latter if he is aware of them or if they are so obvious that any ordinarily prudent person under the circumstances could not fail to observe and appreciate them; but if the employee, having become aware of a risk arising out of a defect attributable to the employer's negligence, makes complaint or objection and obtains a promise of reparation, the common law brings into play a new set of regulations, requiring the employer to assume the risk under certain circumstances, the employee under others. *Seaboard Air Line Ry.* v. *Horton,* 233 U. S. 492, 504, 505; 239 U. S. 595, 598, 599; and cases cited.

But these are no more than rules of law, deduced by the courts as reasonable and just, under the conditions of our civilization, in view of the relations existing between employer and employee *in the absence of legislation.* They are not placed, by the Fourteenth Amendment, beyond the reach of the State's power to alter them, as rules of future conduct and tests of responsibility, through legislation designed to promote the general welfare, so long as it does not interfere arbitrarily and unreasonably, and in

defiance of natural justice, with the right of employers and employees to agree between themselves respecting the terms and conditions of employment.

We are unable to say that the Employers' Liability Law of Arizona, in requiring the employer in hazardous industries to assume—so far as pecuniary consequences go—the entire risk of injury to the employee attributable to accidents arising in the course of the employment and due to its inherent conditions, exceeds the bounds of permissible legislation or interferes with the constitutional rights of the employer. The answer that the common law makes to the hardship of requiring the employee to assume all consequences, both personal and pecuniary, of injuries arising out of the ordinary dangers of the occupation is that the parties enter into the contract of employment with these risks in view, and that the consequences ought to be, and presumably are, taken into consideration in fixing the rate of wages. *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Ross,* 112 U. S. 377, 383; *Northern Pacific R. R. Co.* v. *Herbert,* 116 U. S. 642, 647; *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 199; *Farwell* v. *Boston & Worcester R. R. Corp.,* 4 Metc. 49, 57. In like manner the employer, if required—as he is by this statute in some occupations—to assume the pecuniary loss arising from such injury to the employee, may take this into consideration in fixing the rate of wages; besides which he has an opportunity, which the employee has not, to charge the loss as a part of the cost of the product of the industry.

There is no question here of punishing one who is without fault. That, we may concede, would be contrary to natural justice. But, as we have seen, the statute limits the recovery strictly to compensatory damages. And there is no discrimination between employer and employee except such as necessarily arises from their different relations to the common undertaking. Both are essential

to it, the one to furnish capital, organization, and guidance, the other to perform the manual work; both foresee that the occupation is of such a nature, and its conditions such, that sooner or later some of the workmen will be physically injured or maimed, occasionally one killed, without particular fault on anybody's part.   (See 243 U. S. 203.) The statute requires that compensation shall be paid *to* the injured workman or his dependents, because it is upon them that the first brunt of the loss falls; and that it shall be paid *by* the employer, because he takes the gross receipts of the common enterprise, and by reason of his position of control can make such adjustments as ought to be and practically can be made, in the way of reducing wages and increasing the selling price of the product, in order to allow for the statutory liability. There could be no more rational basis for a discrimination; and it is clear that in this there is no denial of the "equal protection of the laws."

Under the "due process" clause, the ultimate contention is that men have an indefeasible right to employ their fellow men to work under conditions where, as all parties know, from time to time some of the workmen inevitably will be killed or injured, but where nobody knows or can know in advance which particular men or how many will be the victims, or how serious will be the injuries, and hence no adequate compensation can be included in the wages; and to employ them thus with the legitimate object of making a profit above their wages if all goes well, but with immunity from particular loss if things go badly with the workmen through no fault of their own, and they suffer physical injury or death in the course of their employment.   In view of the subject-matter, and of the public interest involved, we cannot assent to the proposition that the rights of life, liberty, and property guaranteed by the Fourteenth Amendment prevent the States from modifying that rule of the common law

which requires or permits the workingman to take the
chances in such a lottery.

The act—assuming, as we must, that it be justly ad-
ministered—adds no new burden of cost to industry, al-
though it does bring to light a burden that previously
existed but perhaps was unrecognized, by requiring that
its costs be taken into the reckoning. The burden is due
to the hazardous nature of the industry, and is inevitable
if the work of the world is to go forward. What the act
does is merely to require that it shall be assumed, to the
extent of a pecuniary equivalent of the actual and prox-
imate damage sustained by the workman or those near
to him, by the employer—by him who organizes the enter-
prise, hires the workmen, fixes the wages, sets a price
upon the product, pays the costs, and takes for his reward
the net profits, if any.

The interest of the State is obvious. We declared in the
*White Case* (243 U. S. 207): "It cannot be doubted that
the State may prohibit and punish self-maiming and
attempts at suicide; it may prohibit a man from barter-
ing away his life or his personal security; indeed, the
right to these is often declared, in bills of rights, to be
'natural and inalienable'; and the authority to prohibit
contracts made in derogation of a lawfully established
policy of the State respecting compensation for accidental
death or disabling personal injury is equally clear. . . .
This statute does not concern itself with measures of pre-
vention, which presumably are embraced in other laws.
But the interest of the public is not confined to these.
One of the grounds of its concern with the continued life
and earning power of the individual is its interest in the
prevention of pauperism, with its concomitants of vice
and crime. And, in our opinion, laws regulating the re-
sponsibility of employers for the injury or death of em-
ployees arising out of the employment bear so close a re-
lation to the protection of the lives and safety of those

concerned that they properly may be regarded as coming within the category of police regulations." (Citing cases.)

And in *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, 239, it was said: "Certainly, the operation of industrial establishments that in the ordinary course of things frequently and inevitably produce disabling or mortal injuries to the human beings employed is not a matter of wholly private concern."

Having this interest, the State of Arizona reasonably might say: "The rule of the common law requiring the employee to assume all consequences of personal injuries arising out of the ordinary dangers and normal conditions of a hazardous occupation, and to secure his indemnity in advance in the form of increased wages, is incompatible with the public interest because—assuming that workmen are on an equality with employers. in a negotiation about the rate of wages—the probability of injury occurring to a particular employee, and the nature and extent of such injury, are so contingent and speculative that it is impracticable for either employer or employee approximately to estimate in advance how much allowance should be made for them in the wages; and even were a proper allowance made, experience demonstrates that under our conditions of life it is not to be expected that the average workingman will set aside out of his wages a proper insurance against the time when he may be injured or killed. Hence, recognizing that injuries to workmen constitute a part of the unavoidable cost of hazardous industries, we will require that it be assumed by the one in control of the industry as employer, just as he pays other items of cost; so that he shall not take a profit from the labor of his employees while leaving the injured ones, and the dependents of those whose lives are lost, through accidents due to the conditions of the occupation, to be a burden upon the public."

Whether this or similar reasoning was employed, we

have no means of knowing; whether, if employed, it ought to have been accepted as convincing, is not for us to decide. It being incumbent upon the opponents of the law to demonstrate that it is clearly unreasonable and arbitrary, it is sufficient for us to declare, as we do, that such reasoning would be pertinent to the subject and not so unfounded or irrational as to permit us to say that the State, if it accepted it as a basis for changing the law in a matter so closely related to the public welfare, exceeded the restrictions placed upon its action by the Fourteenth Amendment.

It is objected that the responsibility of the employer under this statute is unlimited; but this is not true except as it is true of every action for compensatory damages where the amount awarded varies in accordance with the nature and extent of the damages for which compensation is made. It is said that in actions by employees against employers juries are prone to render extravagant verdicts. The same thing has been said, and with equal reason, concerning actions brought by individuals against railroad companies, traction companies, and other corporations. In this, as in other cases, there is a corrective in the authority of the court to set aside an exorbitant verdict. And it amounts to a contradiction of terms to say that in submitting a controversy between litigants to the established courts, there to be tried according to long-established modes and with a constitutional jury to determine the issues of fact and assess compensatory damages, there is a denial of "due process of law."

Much stress is laid upon that part of our opinion in the *White Case* where, after citing numerous previous decisions upholding the authority of the States to establish by legislation departures from the fellow-servant rule and other common-law rules affecting the employer's liability for personal injuries to the employee, we said (243 U. S. 201): "It is true that in the case of the statutes thus

sustained there were reasons rendering the particular departures appropriate.  Nor is it necessary, for the purposes of the present case, to say that a State might, without violence to the constitutional guaranty of 'due process of law,' suddenly set aside all common-law rules respecting liability as between employer and employee, without providing a reasonably just substitute.  . . .  No such question is here presented, and we intimate no opinion upon it. The statute under consideration sets aside one body of rules only to establish another system in its place," etc.

In spite of our declaration that no opinion was intimated, this is treated as an intimation that a statute such as the one now under consideration, creating a new and additional right of action and allowing no defense (if the conditions of liability be shown) unless the accident was caused by the negligence of the injured employee, would be regarded as in conflict with the due process clause.  We cannot, however, regard this statute as anything else than a substitute for the law as it previously stood; whether it be a proper substitute was for the people of the State of Arizona to determine; but we find no ground for declaring that they have acted so arbitrarily, unreasonably, and unjustly as to render their action void. They have resolved that the consequences of a personal injury to an employee attributable to the inherent dangers of the occupation shall be assumed, not wholly by the particular employee upon whom the personal injury happens to fall, but, to the extent of a compensation in money awarded in a judicial tribunal according to the ordinary processes of law, shall be assumed by the employer; leaving the latter to charge it up, so far as he can, as a part of the cost of his product, just as he would charge a loss by fire, by theft, by bad debts, or any other usual loss of the business; and to make allowance for it, so far as he can, in a reduced scale of wages.  And they have come to this resolution, we repeat, not in a matter of in-

difference, or upon a question of mere economics, but in the course of regulating the conduct of those hazardous industries in which human beings—their own people—in the pursuit of a livelihood must expose themselves to death or to physical injuries more or less disabling, with consequent impoverishment, partial or total, of the workman or those dependent upon him. The statute says to the employer, in effect: "You shall not employ your fellow men in a hazardous occupation for gain, you being in a position to reap a reward in money through selling the product of their toil, unless you come under an obligation to make appropriate compensation in money in case of their death or injury due to the conditions of the occupation." The rule being based upon reasonable grounds affecting the public interest, being established in advance and applicable to all alike under similar circumstances, there is, in our opinion, no infringement of the fundamental rights protected by the Fourteenth Amendment.

Some expressions contained in our opinion in the *White Case* (243 U. S. 203, 204, 205,) are treated in argument as if they were equivalent to saying that if a State, in making a legislative adjustment of employers' liability, departs from the common-law system of basing responsibility upon fault, it must confine itself to a limited compensation, measured and ascertained according to the methods adopted in the compensation acts of the present day. Of course nothing of the kind was intended. In a previous part of the opinion (pp. 196–200) it had been shown that the employer had no constitutional right to continued immunity from liability in the absence of negligence, nor to have the fellow-servant rule and the rules respecting contributory negligence and assumption of risk remain unchanged. The statutory plan of compensation for injured workmen and the dependents of those fatally injured—an additional feature at variance with the common law—was then upheld; but, of course, without

saying that no other would be constitutional. For if, as we held in that case, the novel statutory scheme of awarding compensation according to a prearranged scale is sustainable, it follows, perhaps *a fortiori*, that the Arizona method of ascertaining the compensation according to the facts of each particular case—substantially the common law method—is free from objection on constitutional grounds. Indeed, if a State recognizes or establishes a right of action for compensation to injured workmen upon grounds not arbitrary or fundamentally unjust, the question whether the award shall be measured as compensatory damages are measured at common law, or according to some prescribed scale reasonably adapted to produce a fair result, is for the State itself to determine. Whether the compensation should be paid in a single sum after judgment recovered, as is required by the Arizona Employers' Liability Law just as under the common law system in the case of a judgment based upon negligence, or whether it would be more prudent to distribute the award by instalment payments covering the period of disability or of need, likewise is for the State to determine, and upon this the plaintiffs in error can raise no constitutional question.

To the suggestion that the act now or hereafter may be extended by construction to non-hazardous occupations, it may be replied: first, that the occupations in which these actions arose were indisputably hazardous, hence plaintiffs in error have no standing to raise the question (*Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 544; *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, 576; *Hendrick* v. *Maryland*, 235 U. S. 610, 621; *Middleton* v. *Texas Power & Light Co.*, 249 U. S. 152, 157); and secondly, it hardly is necessary to add that employers in non-hazardous industries are in little danger from the act, since it imposes liability only for accidental injuries attributable to the inherent dangers of the occupation.

To the objection that the benefits of the act may be extended, in the case of death claims, to those not nearly related to or dependent upon the workman, or even may go by escheat to the State, it is sufficient to say that no such question is involved in these records; in *Arizona Copper Co. v. Burciaga*, 177 Pac. Rep. 29, a case of personal injuries not fatal, the Supreme Court of Arizona interpreted the act as limiting the recovery to compensatory damages; it reasonably may be so construed in its application to death claims; and it would be improper for this court to assume in advance that the state court will place such a construction upon the statute as to render it obnoxious to the Federal Constitution. *Plymouth Coal Co. v. Pennsylvania*, 232 U. S. 531, 546; *St. Louis Southwestern Ry. Co. v. Arkansas*, 235 U. S. 350, 369.

It is insisted that the Arizona system deprives employers of property without due process of law and denies them equal protection because it confers upon the employee a free choice among several remedies. In *Consolidated Arizona Smelting Co. v. Ujack*, 15 Arizona, 382, 384, the Supreme Court of the State said: "Under the laws of Arizona, an employee who is injured in the course of his employment has open to him three avenues of redress, any one of which he may pursue according to the facts of his case. They are: (1) The common-law liability relieved of the fellow-servant defense and in which the defenses of contributory negligence and assumption of risk are questions to be left to the jury. Const., secs. 4, 5, art. 18. (2) Employers' liability law, which applies to hazardous occupations where the injury or death is not caused by his own negligence. Const., sec. 7, art. 18. (3) The compulsory compensation law, applicable to especially dangerous occupations, by which he may recover compensation without fault upon the part of the employer. Const., sec. 8, art. 18." It is said by counsel that the compensation act, because it limits the recovery,

400.                    HOLMES, J., concurring.

never is resorted to in practice unless the employee has been negligent and hence is debarred of a remedy under the liability act. But it is thoroughly settled by our previous decisions that a State may abolish contributory negligence as a defense; and election of remedies is an option very frequently given by the law to a person entitled to an action; an option normally exercised to his own advantage, as a matter of course.

Other points are suggested, but none requiring particular discussion.

*Judgments affirmed.*

MR. JUSTICE HOLMES concurring.[1]

The plaintiff (the defendant in error) was employed in the defendant's mine, was hurt in the eye in consequence of opening a compressed air valve and brought the present suit. The injury was found to have been due to risks inherent to the business and so was within the Employers' Liability Law of Arizona, Rev. Stats. 1913, Title 14, c. 6. By that law as construed the employer is liable to damages for injuries due to such risks in specified hazardous employments when guilty of no negligence. Par. 3158. There was a verdict for the plaintiff, judgment was affirmed by the Supreme Court of the State, 19 Arizona, 151, and the case comes here on the single question whether, consistently with the Fourteenth Amendment, such liability can be imposed. It is taken to exclude "speculative, exemplary and punitive damages," but to include all loss to the employee caused by the accident, not merely in the way of earning capacity, but of disfigurement and bodily or mental pain. See *Arizona Copper Co.* v. *Burciaga,* 177 Pac. Rep. 29, 33.

There is some argument made for the general proposi-

---

[1] This concurring opinion was delivered in one of the five cases, viz, No. 332, *Inspiration Consolidated Copper Company* v. *Mendez.*

tion that immunity from liability when not in fault is a right inherent in free government and the *obiter dicta* of Mr. Justice Miller in [*Citizens' Savings &*] *Loan Association* v. *Topeka*, 20 Wall. 655, are referred to. But if it is thought to be public policy to put certain voluntary conduct at the peril of those pursuing it, whether in the interest of safety or upon economic or other grounds, I know of nothing to hinder. A man employs a servant at the peril of what that servant may do in the course of his employment and there is nothing in the Constitution to limit the principle to that instance. *St. Louis & San Francisco Ry. Co.* v. *Mathews*, 165 U. S. 1, 22. *Chicago, Rock Island & Pacific Ry. Co.* v. *Zernecke*, 183 U. S. 582, 586. *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Taylor*, 210 U. S. 281, 295. See *Guy* v. *Donald*, 203 U. S. 399, 406. There are cases in which even the criminal law requires a man to know facts at his peril. Indeed, the criterion which is thought to be free from constitutional objection, the criterion of fault, is the application of an external standard, the conduct of a prudent man in the known circumstances, that is, in doubtful cases, the opinion of the jury, which the defendant has to satisfy at his peril and which he may miss after giving the matter his best thought. *The Germanic*, 196 U. S. 589, 596. *Nash* v. *United States*, 229 U. S. 373, 377. *Eastern States Retail Lumber Dealers' Association* v. *United States*, 234 U. S. 600, 610. *Miller* v. *Strahl*, 239 U. S. 426, 434. Without further amplification so much may be taken to be established by the decisions. *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 198, 204. *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, 336.

I do not perceive how the validity of the law is affected by the fact that the employee is a party to the venture. There is no more certain way of securing attention to the safety of the men, an unquestionably constitutional object of legislation, than by holding the employer liable

400.                    HOLMES, J., concurring.

for accidents.  Like the crimes to which I have referred they probably will happen a good deal less often when the employer knows that he must answer for them if they do. I pass, therefore, to the other objection urged and most strongly pressed.  It is that the damages are governed by the rules governing in action of tort—that is, as we have said, that they may include disfigurement and bodily or mental pain.  Natural observations are made on the tendency of juries when such elements are allowed.  But if it is proper to allow them of course no objection can be founded on the supposed foibles of the tribunal that the Constitution of the United States and the States have established.  Why then, is it not proper to allow them? It is said that the pain cannot be shifted to another.  Neither can the loss of a leg.  But one can be paid for as well as the other.  It is said that these elements do not constitute an economic loss, in the sense of diminished power to produce.  They may.  *Ball* v. *William Hunt & Sons,* Ltd., [1912], A. C. 496.  But whether they do or not they are as much part of the workman's loss as the loss of a limb.  The legislature may have reasoned thus.  If a business is unsuccessful it means that the public does not care enough for it to make it pay.  If it is successful the public pays its expenses and something more.  It is reasonable that the public should pay the whole cost of producing what it wants and a part of that cost is the pain and mutilation incident to production.  By throwing that loss upon the employer in the first instance we throw it upon the public in the long run and that is just.  If a legislature should reason in this way and act accordingly it seems to me that it is within constitutional bounds.  *Erickson* v. *Preuss,* 223 N. Y. 365.  It is said that the liability is unlimited, but this is not true.  It is limited to a conscientious valuation of the loss suffered.  Apart from the control exercised by the judge it is to be hoped that juries would realize that unreasonable verdicts would tend to

make the business impossible and thus to injure those whom they might wish to help. But whatever they may do we must accept the tribunal, as I have said, and are bound to assume that they will act rightly and confine themselves to the proper scope of the law.

It is not urged that the provision allowing twelve per cent. interest on the amount of the judgment from the date of filing the suit, in case of an unsuccessful appeal, is void. *Fidelity Mutual Life Association* v. *Mettler*, 185 U. S. 308, 325–327. *Consaul* v. *Cummings*, 222 U. S. 262, 272.

Mr. Justice Brandeis and Mr. Justice Clarke concur in this statement of additional reasons that lead me to agree with the opinion just delivered by my brother Pitney.

Mr. Justice McKenna dissenting.

I find myself unable to concur, yet reluctant to dissent. The case is of the kind that, once pronounced, will be a rule in like or cognate cases forever,—indeed, may even be extended. It is said to rest on the cases sustaining the workmen's compensation law of New York, 243 U. S. 188, and its associated cases in the same volume upholding like laws of other States. The present case certainly comes after those cases and has that symptom of being their sequence. They cannot be said to have been easy of judgment against the contentions and conservatism which opposed them, and there was, at least to me, no prophecy of their extent, and therefore to me the present case is a step beyond them. I hope it is something more than timidity, dread of the new, that makes me fear that it is a step from the deck to the sea—the metaphor suggests a peril in the consequences.

But let me in a more concrete way make application of this comment. I may assume that the purpose and principle and general extent of workmen's compensation laws

400.                    McKenna, J., dissenting.

are known.  I must rest on that assumption for even an
epitome of them or the reasons for them would unduly
extend this dissent.   The Arizona law has no resemblance
to them.   It is a direct charge of liability upon the em-
ployer for death or injury incurred in his employment, he
being without fault.   Its remedies are the ordinary legal
remedies; its measure of relief, however, has in it some-
thing more than the ordinary measures of relief, certainly
not those of the compensation laws, nor is it as consider-
ate and guarded as they.   If its validity, therefore, can
be deduced from the cases explanatory of those laws, it
can only be done by bringing its instances and theirs under
the same generalization, that is, that it is competent for
government to charge liability and exempt from responsi-
bility according as one is employer or employee, there
being no other circumstance than that relation.   Of this
there can be no disguise.   It may be confused by argument
and attempt at historical analogies and deductions, but
to that comprehensive principle the case must come at
last.   All else is adventitious and puts out of view the
relation of the factors of production.   It puts out of view
that employers are as necessary to production as employ-
ees, and subjects to peril the voluntary conduct of the for-
mer and leaves out of account as an element the voluntary
conduct of the latter.   In other words, there is a clear
discrimination,—a class distinction with its legal circum-
stances and, I may say, invidious circumstances, in view of
some of the reasons adduced in its justification.   And these
effects cannot be concealed under any camouflage nor given
the plausible and attractive gloss of public policy, justified
by the different conditions of employer and employee.
Unquestionably there is a difference—it constitutes the
life of the relation.   But the question is, Who shall com-
pensate the injury that may result from the relation,
voluntary assumed by both, urged by their respective
interests and a calculation of advantage?

But I pass this discrimination and return to the law as a violation of the employer's rights considered absolutely and abstractly. It seems to me to be of the very foundation of right—of the essence of liberty as it is of morals—to be free from liability if one is free from fault. It has heretofore been the sense of the law and the sense of the world, pervading the regulations of both, that there can be no punishment where there is no blame; and yet the court now by its decision erects the denial of these postulates of conduct into a principle of law and governmental policy. In other words, it is said to be a benefit to government to put the exact discharge of duty under the menace of penalty and invert the conceptions of mankind of the relation of right and wrong action. If the legislation does not punish without fault what does it do? The question is pertinent. Consider what the employer does: he invests his money in productive enterprise—mining, smelting, manufacturing, railroading—he engages employees at their request and pays them the wages they demand, he takes all of the risks of the adventure. Now there is put upon him an immeasurable element that may make disaster inevitable. I find it difficult to answer the argument advanced to support or palliate this effect or independently of it to justify the interference with rights. It is a certain impeachment of some rights to assume that they need justification and a betrayal of them to make them a matter of controversy. There are precepts of constitutional law as there are precepts of moral law that reach the conviction of aphorisms and are immediately accepted by all who understand them, and comment is considered as confusing as unnecessary. I say this, not in dogmatism, but in expression of my vision of things, and I say it with deference to the contrary judgments of my brethren of the majority.

Of course, reasons may be found for the violation of rights, advantage to somebody or something in that viola-

400.                    McKenna, J., dissenting.

tion.  Tyranny even may find pretexts and seldom boldly
bids its will avouch its acts, and certainly there can be no
accusation of bare-faced power in the Arizona law.  Its
motives and purposes are worthy and it requires some
resolution of duty to resist them.  It must be seen and
is seen, however, that the difference between the position
of employer and employee, simply considering the latter
as economically weaker, is not a justification for the viola-
tion of the rights of the former, and that individual rights
cannot be made to yield to philanthropy, and therefore
the welfare of the government is brought forward and
displayed.  The law saves the government, is the com-
ment, from the burden of paupers, its administration and
peace from the disturbance of criminals.  The answer,
I think, is immediate.  Government, certainly constitu-
tional government, cannot afford to infringe, indeed,
betrays its purpose if it infringes, a right of anybody upon
money considerations or for ease in the exercise of its
faculties.

  But granting that there is something in the argument,
what shall be the limits of its application?  Will it extend
the principle of the present case to non-hazardous em-
ployments?  If not, why not?  The Arizona law stops
with certain occupations which it calls "hazardous," but
it includes in the description "manufacturing" without
qualifying words.  In the New York compensation law
passed on in *New York Central R. R. Co.* v. *White*, 243 U. S.
188, there were forty-two groups of hazardous occupations.
In *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, the
court had quite a struggle with the provisions of the
Washington compensation law, which was so far different
from those of the other cases as to incur the dissent of
members of the court.  It is now, I think, of pertinent
inquiry whether the quality of being hazardous is an in-
herent and necessary element of legality or a matter of
legislative definition and policy.  Besides, if there can be

liability · without fault in one occupation, and that can
be a principle of legislation, why not in any other? Who
is to determine the application, court or legislature? If
the latter, a court may not even express apprehension of
its exercise, and yet it cannot put out of view the drift
of events and in blind fatalism await their incidence when
called upon to consider the legality of such exercise. We
know things are in change—have changed—and a mark
of it is that the drift of public opinion, and of legislation
following opinion, is to alter the relation between employer
and employee and to give to the latter a particular dis-
tinction, relieve him from a responsibility which would
seem to be, and which until lately it has been the sense of
the world to be, as much upon him as upon his employer,
not in dependence, not as a mark of subservience, but as an
obligation of his freedom, and, therefore as a consequence,
that where he has liberty of action he has responsibility
for action. In a word, the drift of opinion and legislation
now is to set labor apart and to withdraw it from its con-
ditions and from the action of economic forces and their
consequences, give it immunity from the pitilessness of
life. And there are appealing considerations for this
drift of opinion and inevitable sympathy with it as with
many other conditions, but which the law cannot relieve
by a sacrifice of constitutional rights. In what legislation
the drift (it is persuasion in some) may culminate cannot
now be predicted, but it is very certain that, whatever it
be, the judgment now delivered will be cited to justify it.
Will it not be said that if one right of an employer can be
made to give way, why not another?—made a condition
"upon economic or other grounds" of his enterprise. In-
deed, may not the question be made more general, and
if in supposed benefit to a particular class, and through
benefit to them to the public, there may be constraint
upon or the imposition of burden upon one right of a
citizen, why not upon another? There is, therefore, I

think, menace in the present judgment to all rights, subjecting them unreservedly to conceptions of public policy. If, however, this general apprehension be not justified, there is threat enough in the judgment of the court to the interest of employers generally as a result of the difference in conditions.

A rather curious argument is used to support the Arizona law. It is said, in justification of its discrimination between employer and employee, that the employer may in relief from it and rescue from its burdens pass them to the consumers of his products, as he does or may do in the case of other expenses of his venture, and in the long-run their incidence is, as it is said it should be, on the public; and that the legislature in so considering was reasoning within constitutional bounds. There is attractive speciousness in the argument. The individual employer seems to be devested of grievance and the problem the law presents to be one of economics and governmental policy; is a kind of taxation, an expense of government, the burden of which is properly laid upon the public and over which a court can have but limited power.

If it is intended by the argument to express no more than a tendency, while it has no relevancy, I think, upon the validity of the law, there may be no danger in it. If it is intended to be erected into a principle, there is danger in it. It is certainly facile and comprehensive. What burden can be put upon industry or the activities of men that may not be justified by it?

Of course, there will be no production unless all of its costs be reimbursed by the price of the articles produced. And by costs I mean as well the burdens of government as profit to the employer—his inducement to enterprise, and the wages of employees—their inducement to labor. Without such reimbursement there will be no production— and cannot be beyond a certain extent and for a certain time; and there is no way to effect it but through the con-

suming public. But recourse to such consumption as a rescue from the law is not a justification for the law, and it is very doubtful if it had any conscious influence in the enactment of the law.

Indeed, in the present case what could have been its influence and to what extent can it have an ameliorating effect? An employer in the indicated industries can have no relief except in the home market. If his products (where there are products) go beyond—go to other States —they will meet the competition of unburdened products. But this is obvious and needs no comment.

THE CHIEF JUSTICE, MR. JUSTICE VAN DEVANTER and MR. JUSTICE McREYNOLDS concur in this dissent.

MR. JUSTICE McREYNOLDS dissenting.

While I earnestly join in the dissent written by Mr. Justice McKenna, it seems not inappropriate to state my own views somewhat more fully. The important and underlying question is common to the five cases. Number 232 is typical and to detail certain facts and circumstances disclosed by the record therein may aid the discussion.

Basing his claim upon the Arizona Employers' Liability Law, Dan Veazey sued plaintiff in error in the United States District Court to recover damages for personal injuries received by him February 10, 1916, while engaged as millwright and carpenter in constructing a "flotation system" at the company's mill or reduction works in Gila County, Arizona "wherein steam, electricity and other mechanical power was then and there used to operate machinery." He alleged that while exercising due care he "suffered severe personal and bodily injuries by an accident arising out of and in course of such labor, service and employment, and due to a condition or conditions of such occupation or employment," which injuries were

not caused by his negligence but were sustained in the manner following: "Plaintiff in the due course of his said labor, service and employment was standing upon a certain timber or joist incorporated in said 'flotation system' engaged in bolting and fastening together the timbers thereof.  That the said timber or joist upon which plaintiff was then and there standing was then and there elevated above the ground or floor of said mill or reduction works a distance of approximately ten feet.  That while so engaged as aforesaid, plaintiff slipped from said timber or joist and fell to the ground  . . . .  with great force and violence . . . ," was permanently injured and will forever remain sick, sore, lame and crippled.

No charge of negligence or failure to perform any duty was made against the company.  It unsuccessfully set up and relied upon invalidity of the Employers' Liability Law because in conflict with the Fourteenth Amendment; judgment went against it; and the cause is here by writ of error to the trial court (Jud. Code, § 237).

Article XVIII of the Arizona Constitution provides:

"Section 4. The common law doctrine of fellow servants, so far as it affects the liability of a master for injuries to his servants resulting from the acts or omissions of any other servant or servants of the common master is forever abrogated.

"Section 5. The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury.

"Section 6. The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

"Section 7. To protect the safety of employees in all hazardous occupations, in mining, smelting, manufacturing, railroad or street railway transportation, or any other industry the Legislature shall enact an Employer's Liability law, by the terms of which any employer,

whether individual, association, or corporation shall be liable for the death or injury, caused by any accident due to a condition or conditions of such occupation, of any employee in the service of such employer in such hazardous occupation, in all cases in which such death or injury of such employee shall not have been caused by the negligence of the employee killed or injured.

"Section 8. The Legislature shall enact a Workmen's Compulsory Compensation law applicable to workmen engaged in manual or mechanical labor in such employments as the Legislature may determine to be especially dangerous, by which compulsory compensation shall be required to be paid to any such workman by his employer, if in the course of such employment personal injury to any such workman from any accident arising out of, and in the course of, such employment is caused in whole, or in part, or is contributed to, by a necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof, or by failure of such employer, or any of his or its officers, agents, or employee, or employees, to exercise due care, or to comply with any [law] affecting such employment; Provided, that it shall be optional with said employee to settle for such compensation, or retain the right to sue said employer as provided by the Constitution."

Obeying the constitutional mandate, the legislature enacted the "Employers' Liability Law," approved May 24, 1912, (c. 89, Laws of Ariz., 1912, p. 491; Rev. Stats. Ariz., 1913, pars. 3153–3162) which provides:

That to protect the safety of workmen at manual or mechanical labor in many occupations declared hazardous and enumerated in § 4—among them all work in or about mines and in mills, shops, plants and factories where steam or electricity is used to operate machinery—every employer, whether individual, association or corporation "shall be liable for the death or injury, caused by any

accident due to a condition or conditions of such occupation, of any employee in the service of such employer in such hazardous occupation, in all cases in which such death or injury of such employee shall not have been caused by the negligence of the employee killed or injured."

"Sec. 6. When in the course of work in any of the employments or occupations enumerated in Sec. 4 of this Act, personal injury or death by any accident arising out of and in the course of such labor, service and employment, and due to a condition or conditions of such occupation or employment, is caused to or suffered by any workman engaged therein, in all cases in which such injury or death of such employee shall not have been caused by the negligence of the employee killed or injured, then the employer of such employee shall be liable in damages to [the] employee injured, or, in case death ensues, to the personal representative of the deceased for the benefit of the surviving widow or husband and children of such employee; and, if none, then to such employee's parents; and, if none, then to the next of kin dependent upon such employee, and if none, then to his personal representative, for the benefit of the estate of the deceased." Section 7 requires that questions of contributory negligence and assumption of risk shall be left to the jury. (The full text of the act is in the margin.[1])

[1] Laws of Arizona, 1912, Chap. 89, p. 491; Rev. Stats., Ariz. Civil Code, 1913, pars. 3153–3162, p. 1051.

"Sec. 1. That this Act is and shall be declared to be an Employer's Liability law as prescribed in Sec. 7 of Article XVIII of the State Constitution.

"Sec. 2. That to protect the safety of employees in all hazardous occupations in mining, smelting, manufacturing, railroad, or street railway, transportation, or any other industry, as provided in said Sec. 7 of Article XVIII of the State Constitution, any employer, whether individual, association, or corporation, shall be liable for the death or injury, caused by any accident due to a condition or conditions of such occupation, of any employee in the service of such em-

Likewise, the legislature enacted a Compulsory Compensation Law, approved June 8, 1912, applicable to work-

ployer in such hazardous occupation, in all cases in which such death or injury of such employee shall not have been caused by the negligence of the employee killed or injured.

"Sec. 3. The labor and services of workmen at manual and mechanical labor, in the employment of any person, firm, association, company, or corporation, in the occupations enumerated in Sec. 4 of this Act are hereby declared and determined to be service in a hazardous occupation within the meaning of the terms of Sec. 2 of this Act.

"By reason of the nature and conditions of, and the means used and provided for doing the work in, said occupations, such service is especially dangerous and hazardous to the workmen therein, because of risks and hazards which are inherent in such occupations and which are unavoidable by the workmen therein.

" Sec. 4. The occupations hereby declared and determined to be hazardous within the meaning of this Act are as follows:

"1. The operation of steam railroads, electrical railroads, street railroads, by locomotives, engines, trains, motors, or cars of any kind propelled by steam, electricity, cable or other mechanical power, including the construction, use or repair of machinery, plant, tracks, switches, bridges, roadbeds, upon, over, and by which such railway business is operated.

"2. All work when making, using or necessitating dangerous proximity to gunpowder, blasting powder, dynamite, compressed air, or any other explosive.

"3. The erection or demolition of any bridge, building or structure in which there is, or in which the plans and specifications require, iron or steel frame work.

"4. The operation of all elevators, elevating machines or derricks or hoisting apparatus used within or on the outside of any bridge, building or other structure for conveying materials in connection with the erection or demolition of such bridge, building or structure.

"5. All work on ladders or scaffolds of any kind elevated twenty (20) feet or more above the ground or floor beneath in the erection, construction, repair, painting or alteration of any building, bridge, structure or other work in which the same are used.

"6. All work of construction, operation, alteration or repair where wires, cables, switchboards, or other apparatus or machinery are in use charged with electrical current.

"7. All work in the construction, alteration, or repair of pole lines for telegraph, telephone or other purposes.

400.                    McReynolds, J., dissenting.

men in the same occupations as those declared hazardous
by the Employers' Liability Law (c. 14, Laws of Ariz.,

---

"8. All work in or about quarries, open pits, open cuts, mines, ore
reduction works and smelters.

"9. All work in the construction and repair of tunnels, sub-ways
and viaducts.

"10. All work in mills, shops, works, yards, plants and factories
where steam, electricity, or any other mechanical power is used to
operate machinery and appliances in and about such premises.

"Sec. 5. Every employer, whether individual, firm, association,
company or corporation, employing workmen in such occupation, of
itself or through an agent, shall by rules, regulations, or instructions,
inform all employees in such occupations as to the duties and restric-
tions of their employment, to the end of protecting the safety of em-
ployees in such employment.

"Sec. 6. When in the course of work in any of the employments or
occupations enumerated in Sec. 4 of this Act, personal injury or death
by any accident arising out of and in the course of such labor, service
and employment, and due to a condition or conditions of such occupa-
tion or employment, is caused to or suffered by any workman engaged
therein, in all cases in which such injury or death of such employee
shall not have been caused by the negligence of the employee killed
or injured, then the employer of such employee shall be liable in dam-
ages to employee injured, or, in case death ensues, to the personal
representative of the deceased for the benefit of the surviving widow
or husband and children of such employee; and, if none, then to such
employee's parents; and, if none, then to the next of kin dependent
upon such employee, and if none, then to his personal representative for
the benefit of the estate of the deceased.

"Sec. 7. In all actions hereafter brought against any such employer
under or by virtue of any of the provisions of this Act to recover dam-
ages for personal injuries to any employee, or where such injuries have
resulted in his death, the question whether the employee may have
been guilty of contributory negligence, or has assumed the risk, shall
be a question of fact and shall at all times be left to the jury, as pro-
vided in Sec. 5 of Article XVIII of the State Constitution.

"Sec. 8. That any contract, rule, regulation, or device whatsoever,
the purpose or intent of which shall be to enable any employer to
exempt himself or itself from any liability created by this Act, shall
to that extent be void; provided, that in any action brought against
any such employer under or by virtue of any of the provisions of this

Spec. Sess. 1912, p. 23). Material portions of it are in the margin.[1]

___

Act, such employer may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity or that [it] may have paid to the injured employee or his personal representative on account of the injury or death for which said action was brought.

"Sec. 9. In all actions for damages brought under the provisions of this Act, if the plaintiff be successful in obtaining judgment; and if the defendant appeals to a higher court; and if the plaintiff in the lower court be again successful; and the judgment of the lower court is sustained by the higher court or courts; then, and in that event the plaintiff shall have added to the amount of such judgment by such higher court or courts, interest at the rate of 12 per cent. per annum on the amount of such judgment from the date of the filing of the suit in the first instance until the full amount of such judgment is paid.

"Sec. 10. No action shall be maintained under this Act unless commenced within two years from the day the cause of action accrued.

"Sec. 11. All Acts and parts of Acts in conflict herewith are hereby repealed.

"Whereas, the State Constitution commands the enactment of an Employers' Liability law by the Legislature at its first session; and

"Whereas, this Act being said Employers' Liability law is immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, and this Act shall be in full force, and effect from and after its passage and its approval by the Governor, and is hereby exempt from the operation of the Referendum provision of the State Constitution."

[1] *Workmen's Compulsory Compensation Law.*

Sec. 2. That compensation graduated according to average earnings and limited to $4,000.00, "shall be paid by his employer to any workman engaged in any employment declared and determined . . . to be especially dangerous, whether said employer be a person, firm, association, company, or corporation, if in the course of the employment of said employee personal injury thereto from any accident arising out of, and in the course of, such employment is caused in whole, or in part, or is contributed to, by a necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof, or by failure of such employer, or any of his or its officers, agents, or employee or employees, to exercise due care, or to comply with any law affecting such employment."

"Sec. 4. In case such employee or his personal representative shall

In *Consolidated Arizona Smelting Co. v. Ujack,* (1914) 15 Arizona, 382, 384, the Supreme Court declared:—"Under the laws of Arizona, an employee who is injured in the course of his employment has open to him three avenues of redress, any one of which he may pursue according to the facts of his case.   They are: (1) The common-law liability relieved of the fellow-servant defense and in which the defenses of contributory negligence and assumption of risk are questions to be left to the jury.   Const., secs. 4, 5, art. 18.   (2) Employers' liability law, which applies to hazardous occupations where the injury or death is not caused by his own negligence.   Const., sec. 7, art. 18.   (3) The compulsory compensation law, applicable to especially dangerous occupations, by which he may recover compensation without fault upon the part of the employer.   Const., sec. 8, art. 18."

In *Inspiration Consolidated Copper Co. v. Mendez,* (July 2, 1917) 19 Arizona, 151, 154, 157, 161, the Supreme Court specifically held that the Employers' Liability Law does not conflict with the Fourteenth Amendment, and, among other things, said:—"That the liability statute must

---

refuse to settle for such compensation (as provided in Sec. 8 of Article XVIII of the State Constitution) and chooses to retain the right to sue said employer (as provided in any law provided for in Sec. 7, Article XVIII of the State Constitution) he may so refuse to settle and may retain said right."   "Sec. 6. The common law doctrine of no liability without fault is hereby declared and determined to be abrogated in Arizona as far as it shall be sought to be applied to the accidents hereinbefore mentioned."   "Sec. 14. . . . Provided, if, after the accident, either the employer or the workman shall refuse to make or accept compensation under this Act or to proceed under or rely upon the provisions hereof for relief, then the other may pursue his remedy or make his defense under other existing statutes, the State Constitution, or the common law, except as herein provided, as his rights may at the time exist.   Any suit brought by the workman for a recovery shall be held as an election to pursue such remedy exclusively."

be construed as one creating a liability for accidents resulting in injuries to the workmen engaged in hazardous occupations due to the risks and hazards inherent in such occupations, without regard to the negligence of the employer, as such negligence is understood in the common law of liability; in other words, such statute creates a liability for accident arising from the risks and hazards inherent in the occupation without regard to the negligence or fault of the employer. . . . In other words, this statute creates a liability of the master to damages suffered from any accident befalling his servant while engaged in the performance of duties in dangerous occupations without requiring the negligence of the master to be shown as an element of the right to recover; and it likewise takes away from the master his common-law right of defense of assumption of ordinary risk by the servant, and leaves to the master the right to defend upon the grounds that the servant assumed the ordinary risks other than risks inherent in the occupation." This opinion was reaffirmed in *Superior & Pittsburg Copper Co.* v. *Tomich*, (July 2, 1917) 19 Arizona, 182.

In *Arizona Copper Co.* v. *Burciaga*, (1918) 177 Pac. Rep. 29, 31, 32, 33, the Supreme Court said:—"As clearly intimated by this court in *Inspiration Consolidated Copper Co.* v. *Mendez*, 19 Arizona, 151; 166 Pac. 278, 1183, the Employers' Liability Law is designed to give a right of action to the employee injured by accident occurring from risks and hazards inherent in the occupation and without regard to the negligence on the part of the employer. Such is the clear import of the said Employers' Liability Law. . . .

"The liability incurred by the employer from a personal injury sustained by his employee from an accident arising out of and in the course of labor, service, and employment in hazardous occupations specified in the statute, and due to a condition or conditions of such occupation

or employment, if such shall not have been caused from the negligence of such employee, is such an amount as will compensate such employee for the injuries sustained by him directly attributable to such accident. . . . 'Liable in damages,' as used in paragraph 3158, c. 6, of title 14, Employers' Liability Law, Rev. Stat. of Ariz. 1913, has reference to and means that the employer becomes obligated to pay to the employee injured in an accident while engaged in an occupation declared hazardous, occurring without fault of the employer, all loss to the employee which is actually caused by the accident and the amount of which is susceptible of ascertainment. . . . Of course, mental and physical suffering experienced by the employee injured, proximately resulting from the accident, the reasonable value of working time lost by the employee, necessary expenditures for the treatment of injuries and compensation for the employee's diminished earning power directly resulting from the injury, and perhaps other results causing direct loss, are matters of actual loss and as such recoverable.''

From the foregoing it appears that we have for consideration a statute which undertakes, in the absence of fault, to impose upon all employers (individual and corporate) engaged in enterprises essential to the public welfare, not subject to prohibition by the State and often not attended by any extraordinary hazard, an unlimited liability to employees for damages resulting from accidental injuries—including physical and mental pain—which may be recovered by the injured party or his administrator for benefit of widow, children, parents, next of dependent kin or the estate. The individual who hires only one man and works by his side is put on the same footing as a corporation which employs thousands; no attention is given to probable ability to pay the award; length of service is unimportant—a minute seems enough; wages contracted for bear no necessary relationship to what may be re-

covered; and a single accident which he was powerless to prevent or provide against may pauperize the employer. And by reason of existing constitutional and statutory provisions an injured workman may claim under this act or under the Compensation Law or according to the common law materially modified in his favor by exclusion of the fellow-servant rule and otherwise. On the other hand, while the employer is declared subject to new, uncertain and greatly enlarged liability, notwithstanding the utmost care, nothing has been granted him in return.

In such circumstances, would enforcement of the challenged statute deprive employers of rights protected by the Fourteenth Amendment? Plainly, I think, nothing short of an affirmative answer is compatible with well-defined constitutional guarantees.

Of course the Fourteenth Amendment was never intended to render immutable any particular rule of law nor did it by fixation immortalize prevailing doctrines concerning legal rights and liabilities. Orderly and rational progress was not forestalled. *Holden* v. *Hardy,* 169 U. S. 366, 387. But it did strip the States of all power to deprive any person of life, liberty or property by arbitrary or oppressive action—such action is never due process of law.

In the last analysis it is for us to determine what is arbitrary or oppressive upon consideration of the natural and inherent principles of practical justice which lie at the base of our traditional jurisprudence and inspirit our Constitution. A legislative declaration of reasonableness is not conclusive; no more so is popular approval—otherwise constitutional inhibitions would be futile. And plainly, I think, the individual's fundamental rights are not proper subjects for experimentation; they ought not to be sacrificed to questionable theorization.

Until now I had supposed that a man's liberty and property—with their essential incidents—were under the

protection of our charter and not subordinate to whims or caprices or fanciful ideas of those who happen for the day to constitute the legislative majority.  The contrary doctrine is revolutionary and leads straight towards destruction of our well-tried and successful system of government. Perhaps another system may be better—I do not happen to think so—but it is the duty of the courts to uphold the old one unless and until superseded through orderly methods.

After great consideration in *Adair* v. *United States*, 208 U. S. 161, and *Coppage* v. *Kansas*, 236 U. S. 1, this court declared that the Fourteenth Amendment guarantees to both employer and employee the liberty of entering into contracts for service subject only to reasonable restrictions.  "The principle is fundamental and vital."

In the first case an act of Congress prohibiting interstate carriers from requiring one seeking employment, as a condition of such employment, to enter into an agreement not to become or remain a member of a labor organization was declared in conflict with the Fifth Amendment. In *Coppage* v. *Kansas* a state statute which declared it unlawful to require one to agree not to be a member of a labor association as a condition of securing employment was held invalid under the Fourteenth Amendment and we said: "An interference with this liberty so serious as that now under consideration, and so disturbing of equality of right, must be deemed to be arbitrary, unless it be supportable as a reasonable exercise of the police power of the State."  In *Truax* v. *Raich*, 239 U. S. 33, 41, an Arizona statute prohibiting employment of aliens except under certain conditions was struck down.  We there said: "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."

The right to employ and the right to labor are correl-

ative—neither can be destroyed nor unduly hindered without impairing the other. The restrictions imposed by the act of Congress, struck down in the *Adair Case*, by the Kansas statute, declared invalid in the *Coppage Case*, and by the Arizona statute, held inoperative in the *Truax Case*, viewed as practical matters seem rather trivial in comparison with the burden laid on employers by the statute before us. And the grounds suggested to support it really amount in substance to asserting that the legislature has power to protect society against the consequences of accidental injuries and, therefore, it may impose the loss resulting therefrom upon those wholly without fault who have afforded others welcomed opportunities to earn an honest living under unobjectionable conditions. As a measure to stifle enterprise, produce discontent, strife, idleness and pauperism the outlook for the enactment seems much too good.

In *New York Central R. R. Co.* v. *White*, and *Mountain Timber Co.* v. *Washington*, 243 U. S. 188, 219, as I had supposed for reasons definitely pointed out, we held the challenged statutes not in conflict with the Fourteenth Amendment although they imposed liability without fault and introduced a plan for compensating workmen, unknown to the common law. The elements of those statutes regarded as adequate to save their validity we specified; if such characteristics had not been found, the result, necessarily, would have been otherwise unless we were merely indulging in harmful chatter.

Here, without fault, the statute in question imposes liability in some aspects more onerous than either the New York or Washington law prescribed; and the grounds upon which we sustained those statutes are *wholly* lacking. The employer is not exempted from any liability formerly imposed; he is given no *quid pro quo* for his new burdens; the common-law rules have been set aside without a reasonably just substitute; the employee is relieved from

400.                    McReynolds, J., dissenting.

consequences of ordinary risks of the occupation and these are imposed upon the employer without defined limit to possible recovery which may ultimately go to non-dependents, distant relatives, or, by escheat, to the State; "the act bears no fair indication of a just settlement of a difficult problem affecting one of the most important of social relations"—on the contrary it will probably intensify the difficulties.

The liability is not restricted to the pecuniary loss of a disabled employee or those entitled to look to him for support, but includes compensation for physical and mental pain and suffering; a recovery resulting in bankruptcy to an employer may benefit only a distant relative, financially independent; the prescribed responsibility is not "to contribute reasonable amounts according to a reasonable and definite scale by way of compensation for the loss of earning power arising from accidental injuries," but is unlimited, unavoidable by any care, incapable of fairly definite estimation in advance and enforceable by litigation probably acrimonious, long drawn out and expensive. While the statute is inattentive to the employer's fault it permits recovery in excess of the employee's pecuniary misfortune; and provides for compensation, not general, but sporadic, uncertain, conjectural, delayed, indefinite as to amount and not distributed over such long period as to afford actual protection against loss or lessened earning capacity with insurance to society against pauperism, etc.

I am unable to see any rational basis for saying that the act is a proper exercise of the State's police power. It is unreasonable and oppressive upon both employer and employee; to permit its enforcement will impair fundamental rights solemnly guaranteed by our Constitution and heretofore, as I think, respected and enforced.

The Chief Justice, Mr. Justice McKenna and Mr. Justice Van Devanter concur in this opinion.