### NEW CORNELIA COPPER CO. v. ESPINOZA.

(Circuit Court of Appeals, Ninth Circuit. September 7, 1920. On Rehearing, October 18, 1920.)

#### No. 3437.

1. **Constitutional law** ⟐⟐20—**Legislative interpretation, followed by acquiescence, will be accepted.**

   An act passed almost contemporaneously with the going into effect of the Constitution and interpreting its provisions will be accepted as a correct interpretation, after acquiescence for 8 years.

2. **Master and servant** ⟐⟐372—**Injury by explosion before beginning work held not within state Employers' Liability Act.**

   Employers' Liability Law Ariz. § 4, cl. 2, protecting employés in all work necessitating dangerous proximity to explosives, is not applicable to a miner, injured by an explosion which occurred on the surface of the soil in the morning, before beginning work, resulting from a fire built by the servant to warm himself.

3. **Master and servant** ⟐⟐409½, New, vol. 7A Key-No. Series—**Evidence to establish claim under state Employers' Liability Act for injury from explosion held insufficient to go to jury.**

   In an action for a miner's death, under Employers' Liability Law Ariz. § 4, cl. 2, protecting employés required to be in dangerous proximity to explosives, evidence *held* insufficient to go to the jury.

In Error to the District Court of the United States for the District of Arizona; William H. Sawtell, Judge.

⟐⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by Ignacio S. Espinoza, as administrator of the estate of Jose Maria Ochoa, deceased, against the New Cornelia Copper Company. Judgment for plaintiff, and defendant brings error. Reversed.

Cleon T. Knapp, of Bisbee, Ariz., and Boyle & Pickett, of Douglas, Ariz., for plaintiff in error.

Kibbey, Bennett & Jenckes, of Phœnix, Ariz., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The plaintiff, as administrator of the estate of Jose Maria Ochoa, deceased, brought this action in the lower court to recover damages from the defendant for the death of the deceased, under two causes of action specified in the complaint, to wit: Under the "Employers' Liability Law of Arizona," and also under the common-law liability, alleging certain negligent acts and omissions upon the part of the defendant. Upon motion, plaintiff was required to elect as between the two causes of action alleged by him in the complaint, whereupon the plaintiff elected to proceed under the Employers' Liability Law (Laws Ariz. 1912, c. 89), which is the first cause of action.

It is alleged in the complaint: That on or about the 27th day of November, 1918, the defendant, was, had been for a long time theretofore, ever since has been, and now is engaged in the business and occupation of mining and operating its mines at and near Ajo, in the county of Pima, in the state of Arizona, and in the extraction of ores therefrom by means, among other methods, of tunnels, open pits, shafts, and other excavations into the earth. That in the prosecution of said work the defendant used in and about said mines large quantities of gunpowder, blasting powder, dynamite, compressed air, and other explosives. That on said November 27, 1918, said Jose Maria Ochoa was employed by the defendant to work in and about the working and operation of said mines then being operated by the defendant as aforesaid, and was actually engaged in work and labor under said employment, in and about said mines, and in dangerous proximity to said gunpowder, blasting powder, dynamite, and other explosives which were then upon and about said mines, and had been placed there by the defendant for use in the carrying on of its said work of mining. That said Ochoa had no notice or knowledge of the dangerous proximity to him, of said gunpowder, blasting powder, dynamite, and other explosives. That while said Ochoa was so upon said mines, and while there actually engaged in the work and labor for which he had as aforesaid been employed by the defendant, and while in said dangerous proximity to said gunpowder, blasting powder, dynamite, and other explosives, said gunpowder, blasting powder, dynamite, and other explosives were, without any fault of the said Ochoa exploded. That by the effect of said explosion said Ochoa was killed. That the said death of said Ochoa was not caused by the negligence of said deceased. That by reason of the premises and by virtue of the laws of the state of Arizona in such case made and provided, namely, by virtue of the provisions of chapter 6, title 14, Revised Statutes of the state of Arizona of 1913, relating to the "liability of

employers for injuries to workmen in dangerous occupations," the defendant was liable in damages to the plaintiff, as administrator of said estate of said Jose Maria Ochoa, deceased, and for the benefit of his surviving widow and children; and plaintiff, as such administrator, alleged that by reason of the premises the said estate of said Jose Maria Ochoa, deceased, has sustained damages in the sum of $20,000, for which sum plaintiff prays for a judgment against defendant and for his costs of suit.

The defendant demurred to the complaint upon the ground that said Employers' Liability Law and section 7 of article 18 of the Constitution of the state of Arizona are both unconstitutional and void, in that said provisions are contrary to and contravene the Fourteenth Amendment to the Constitution of the United States, in that said provisions deprive the defendant of its property without due process of law and deny to it the equal protection of the law, by subjecting it to unlimited liability for damages for personal injuries by its employés, without any fault or negligence on the part of the defendant causing such injury, or contributing thereto, and therefore that plaintiff's complaint fails to state facts sufficient to constitute a cause of action. Defendant also denied each and every allegation contained in the complaint, and alleged that if the deceased was killed, either as alleged in the complaint or otherwise, his death wholly resulted from and was wholly caused by decedent's willful neglect and carelessness, and his failure to use any care or caution in his own behalf at the time and place of said alleged accident.

At the close of the testimony for plaintiff the defendant moved the court for an instructed verdict in favor of the defendant which motion was denied. At the close of the testimony for the defendant, the defendant again moved the court for an instructed verdict in its favor which motion was denied. The case was submitted to the jury, who returned a verdict in favor of the plaintiff and against the defendant in the sum of $10,000, whereupon a judgment was entered for said amount, with costs of suit. A motion for a new trial was denied. From the said judgment the defendant sued out a writ of error from this court. The parties will be designated as in the court below.

It has been determined by the Supreme Court of the United States, in Arizona Employers' Liability Cases, 250 U. S. 400, 39 Sup. Ct. 553, 63 L. Ed. 1058, 6 A. L. R. 1537, that the constitutional provision of the state of Arizona and the Employers' Liability Act here involved are not repugnant to the provisions of the Fourteenth Amendment of the Constitution of the United States and that question is no longer in issue in this case.

The Constitution of the state of Arizona provides, in article 18, section 7, as follows:

"To protect the safety of employés in all hazardous occupations, in mining * * * the Legislature shall enact an Employers' Liability Law, by the terms of which any employer * * * shall be liable for the death or injury, caused by any accident due to a condition or conditions of such occupation, of any employé in the service of such employer in such hazardous occupation, in all cases in which such death or injury of such employé shall not have been caused by the negligence of the employé killed or injured." Revised Statutes of Arizona 1913, p. 168.

This Constitution of the state came into effect upon the admission of the state into the Union February 14, 1912, Id. p. 195. The act of May 24, 1912, passed at the first regular session of the Legislature of the state of Arizona (chapter 89 of the Session Laws of Arizona of 1912, p. 491; Revised Statutes of Arizona 1913, §§ 3153–3162), is declared in section 1 to be an Employers' Liability Law, as prescribed in the foregoing section of the Constitution. Section 2 of the act refers to the constitutional provision and follows strictly its language. Section 3 of the act provides by way of declaration and determination a legislative construction for the words "hazardous occupation" as used in the Constitution and in the act. It provides that—

"The labor and services of workmen at manual and mechanical labor, in the employment of any person, firm, association, company, or corporation, in the occupations enumerated in" section 4 of this act, "are hereby declared and determined to be service in a hazardous occupation within the meaning of the terms of" section 2 of this act.

To this legislative construction of the words "hazardous occupation" there is added the specific declaration that such occupations are dangerous and hazardous to the workmen therein because of the risks and hazards which are inherent in such occupations and which are unavoidable by the workmen therein. The declaration is as follows:

"By reason of the nature and conditions of, and the means used and provided for doing the work in, said occupations, such service is especially dangerous and hazardous to the workmen therein, because of risks and hazards which are inherent in such occupations and which are unavoidable by the workmen therein."

Section 4 declares and determines certain occupations to be hazardous within the meaning of the act, among others in clause 2 of the section:

"All work when making, using, or necessitating dangerous proximity to gunpowder, blasting powder, dynamite, compressed air, or any other explosive."

In Endlich on the Interpretation of Statutes, § 527, the author, commenting on the weight to be given the legislative interpretation of constitutional provisions, says:

"The greatest deference is shown by the courts to the interpretation put upon the Constitution by the Legislature, in the enactment of laws and other practical application of constitutional provisions has had the silent acquiescence of the people, including the legal profession and the judiciary and especially when injurious results would follow the disturbing of it. The deference due to such legislative exposition is said to be all the more signal when the latter is made almost contemporaneously with the establishment of the Constitution and may be supposed to result from the same views of policy and modes of reason that prevailed among the framers of the instrument thus expounded."

In 8 Cyc. p. 37, it is said that the practical construction of constitutional provisions by the legislative department in the enactment of laws necessarily has great weight with the judiciary and is sometimes followed by the latter when clearly erroneous. To the same effect is the rule stated in 12 Corpus Juris, p. 714.

[1] The act of May 24, 1912, was passed almost contemporaneously with the going into effect of the Constitution, and for eight years it has

been acquiesced in by the people of the state and by the judiciary as a correct interpretation of the Constitution. We see no reason why it should not be accepted in all its terms as a correct exposition of the Employers' Liability Law.

For a month and a few days prior to November 27, 1918, Jose Maria Ochoa was employed by the defendant in its mine near Ajo, in Pima county, Ariz. On that date Ochoa left his residence about 6:30 in the morning for the mine, where he was due to go to work at 7 o'clock. He arrived at a point on the surface about 30 or 40 feet from the entrance to the mine at about 6:45 o'clock, or about 15 minutes before the time he was required to descend to his work in the mine. He stopped at this point and built a fire with wood about 10 or 15 feet to the side of the road. An explosion in the wood killed him.

Juan Delgado, a witness for the plaintiff, testified as to what occurred. This testimony is without contradiction:

"I knew Jose Maria Ochoa, the deceased. I was going to my work when he was killed. The deceased was near a fire which he (the deceased) had built. The fire was within the lines of the copper company. At that time 8 or 10 more men were with me and the deceased. They were all by the fire. The deceased alone built the fire. I arrived at the place as soon as the deceased built the fire. The others began to come afterwards. The fire was within the land of the company, about 35 or 40 feet to one side of the quarry hole in which the men were supposed to work. We were all going to work in the quarry hole that day. We were waiting for our time to go to work. I and the others went to work in the quarry hole after we picked up the deceased. Before the accident the deceased had been working in the quarry hole about a month, more or less. There was some powder under some wood, and the deceased didn't know that there was any powder there, and he lit some papers there. The powder was under the fire. It was concealed under the wood on the surface. It was not customary for the employés coming to work in the morning to build fires to warm themselves before actually going in to the work. In the mines they use gunpowder, dynamite, and other explosives. I used powder in working in the mine. I got the powder that I used in the mine from the powder house. All the workmen there who used powder get it in the same way. A man in charge, who works for the copper company, furnished the powder from the powder house. The powder used by the men belonged to the New Cornelia Copper Company. The workmen used only that part of the powder furnished each day that was necessary. I do not know where the powder came from that exploded. The day of the accident was a cold day there."

On cross-examination the witness testified that—

"The accident occurred at 7 minutes to 7. The deceased, myself, and the other men were supposed to begin work at 7 o'clock. The deceased, before the explosion, called me and the other men. I was standing, at the time of the explosion, on the ground 6 or 7 feet from the fire, with my back to it. Immediately after the explosion the deceased was lying down about 8 feet from me. I spoke to him, and notified the foreman, who came and asked the men to help. I took care of the deceased until an automobile came and took him to the hospital, where the doctors took charge of him. I went to the hospital with the deceased, where the deceased died at 10 o'clock in the morning. I left the hospital and went to my work. There was a path leading to the entrance of the mine, and the fire built by the deceased was about 10 or 15 feet to the side of the road."

This was all the evidence for the plaintiff relating to the accident and its cause, when the plaintiff rested his case. The defendant thereupon moved the court to instruct the jury to return a verdict for the

defendant. The court was in doubt as to whether the mere fact that the dynamite was placed there by some unknown person was one of the conditions of the employment. Thereupon the plaintiff was permitted to recall the witness Juan Delgado as to the practice of the employés in the handling of the powder belonging to the company. The witness testified that:

"I have observed the handling of powder by the other employés of the mine. They get the powder by means of a report. In my experience I never had powder left at the close of the day; they just give what powder is necessary. If it happened that a little more was given than necessary, it would be returned to the powder house. I never knew of an instance where powder not used was not returned to the powder house. I came here as a witness for the company. * * * I worked for the company a year and a month. During that time there was never any other explosion of powder buried around the property. This was the only instance I ever heard of where a man was injured on top of the ground by powder, and the only instance I ever knew of where powder was placed around on top of the ground."

The court thereupon denied the motion of the defendant for an instructed verdict in its favor. The defendant then called Charles W. McHenry, the mine foreman, who testified that:

"The deceased was employed as a miner at the time of his death. The deceased's duties were running a jack-hammer and blasting. On the day the deceased was killed, he was supposed to work in the glory hole, which is an outcropping of ore that had been mined from 30 to 75 feet below the level of the surrounding country. The deceased's duty was to drill inside of the edge of said glory hole and let the rock cave to the bottom. It was not deceased's duty to light any fires either to warm himself or for any other purpose. The defendant company has no particular rule about lighting fires, but dries and stoves are furnished, and the men are asked not to build fires to warm themselves. I do not know whether there were any such dries or houses on the morning deceased was killed, but it is the practice to provide a place for the men. I was new on the ground at the time the deceased was killed. The place of the explosion where the deceased was killed was 20 or 30 feet from the rim of the glory hole, which is from 30 to 75 or 80 feet deep and approximately 200 feet long. The place where the deceased would be working was 200 feet, more or less from the place where the explosion occurred. Eight or 10 minutes before 7 o'clock in the morning, there was an explosion, which should not have occurred at that particular time, and was out of the ordinary. * * * The deceased was not working at the time of the accident. The defendant company kept a powder house with a man in charge on each level, where its men were working. If a few men are working, the shift boss is also in charge of the powder magazine. The houses are supplied with order books, which state the number of sticks of powder, the number of feet of fuse, and the number of caps to be used. At the bottom of the order is the number of the miner who gets the order. The order has to be signed by the shift boss for a man to get powder. The man asks the shift boss for the exact amount of powder that is needed, and the order is based upon the man's report. All powder not used shall be returned immediately to the powder house. There are instances, rather rare, where a man orders enough powder for filling all holes, and something has happened, a hole has caved, and he can't get the powder in, and there is a stick that is to be returned. The rule is that the powder is to be returned to the powder house. There are times when men have powder left over. Unless the men return the powder left over to the powder house, I do not know what they might do. It is possible that some powder left over might not be returned to the powder house. It is done. I do not know whether deceased was killed by dynamite or powder, or whether the powder or dynamite was owned or controlled in any way by the defendant company. In my experience with the company, there was never an explosion such as oc-

curred when the deceased was killed. I do not recall a case where an explosion occurred of powder or dynamite left upon the surface or placed around for safe-keeping. There had been other unexpected powder explosions in the mine, but none that I recall from powder that had been left around or placed anywhere for safe-keeping. On my recommendation, made immediately after I started to work on September 1, 1918, the defendant company provided dries for the men, places for the men to warm by, and the company asked the men not to build fires outside; but I could not say positively that such places were working at the time deceased was killed. Before the time of the accident, the weather was too warm for the men to build fires around. When I first landed on the job, I asked for a dry on account of the men being wet below, and not because of weather conditions on top. The men on the surface had no use, particularly, for a fire until along about the first of the year. The entrance where the deceased would go into the glory hole was about 30 feet away from the fire, and after he got into the glory hole he would walk under the rim of it some way to his place of work, a gradual incline from the rim of the glory hole down to the bottom. Neither powder nor dynamite would be placed at the spot where the deceased was killed, to be used in the work in the mine. I presume it had been placed there, since there was an explosion; but whether it was powder or dynamite I could not say. The powder used by the company was Hercules 40 per cent., commonly called giant powder."

Peter R. Brady, the shift boss, testified that—

"The deceased's duties were drilling and blasting ground. At the time of the accident, there were orders that any powder left over after the holes were filled was to be returned to the powder house. The powder was kept in a little powder house built of corrugated iron about 300 feet from where the accident occurred. I had charge of the powder when I was on shift. The shift boss is supposed to measure the holes after they are drilled and more or less determine the amount of powder that is to be used. When the men get through drilling the powder is issued to them, and there is a note made of the powder issued, and if there is any powder left through some accident to the hole, being filled or caved in, the men are supposed to return it to the powder house. I do not remember that there were any instructions on the day of the explosion with reference to building fires around the property; but we would not allow the men to build any fires around the works on account of the lumber that was piled up there. My instructions were not to allow the fires anywhere around the works. When the men did not return powder left over, there had to be some kind of an accounting, because I was responsible for the powder that they used. By the rule regarding the return of left-over powder to the powder house, I mean the men were supposed to avoid danger in leaving powder scattered around the works. As far as I can recall, the men on my shift always obeyed these instructions. I cannot say about the other shifts. There possibly may have been instances where powder was not returned to the powder house according to instructions; but I do not recall any such, and I have been on the works two years."

Thereupon the defendant renewed its motion for an instructed verdict in its favor, which the court denied.

[2] The statute (clause 2 of section 4, Act of May 24, 1912) protects the employé at manual and mechanical labor in all work where it is necessary for him to be in dangerous proximity to gunpowder, blasting powder, dynamite, or any other explosive. It was necessary for the deceased to be in dangerous proximity to at least one of these explosives, when he was at work in the mine, where such explosives were being used by the defendant in prosecuting its mining operations; but the deceased was not at work in the mine at the time of the explosion caus-

ing his death, and he was not in dangerous proximity to the explosive being used in the mine. He was on the surface, where no mining operations were being carried on by the defendant, and where it was not using explosives. The deceased was employed by the defendant to work in the mine, and not on the surface. The hazardous occupation in which the deceased was engaged was in the mine, and not on the surface. The building of a fire on the surface was no part of defendant's mining operations. It was the deceased's voluntary act, at a point 10 or 15 feet to the side of the road, and before he had gone to work, and against the general instructions of the mine foreman. The powder or dynamite was not placed under the wood by the defendant, or by its direction or consent. It was concealed under the wood, and the inference is that, if it was obtained from the defendant, it was taken without authority and was a tortious act.

The risk or hazard which the deceased incurred in being near the fire on the surface was not a risk or hazard inherent in the work in the mine, and in the doing of that work the risk or hazard was avoidable by the deceased. It was an outside venture, unattached to the hazardous employment in which he was engaged when at work in the mine. He need not have gone there; he need not have started the fire. The work for which deceased was employed did not necessitate his presence near the fire on the surface, or near the explosive that was there, or at that place at all. It did not necessitate his dangerous proximity to gunpowder or dynamite at or near the place of the accident.

In Arizona Eastern Railway Co. v. Matthews, 20 Ariz. 282, 180 Pac. 159, the plaintiff was employed as a bill clerk at a railroad freight house. He was injured by falling into a scale pit being constructed by the railroad company along the usual route traveled by himself and others having business in and about defendant's freight depot. The plaintiff was employed during the night-time. The accident occurred between 4 and 5 o'clock in the morning, when he was returning from luncheon at a nearby restaurant. The plaintiff was injured, and claimed damages from the railroad company under the Employers' Liability Act. Upon a trial before a jury a verdict was returned in his favor for $3,000. The defendant appealed to the Supreme Court. In the opinion of that court there is an elaborate discussion of the constitutional and legislative provisions of the Employers' Liability Law, particularly the clause in the Constitution protecting the safety of employés in all hazardous occupations, by placing the liability for the death or injury to such employé "caused by any accident due to a condition or conditions of such occupation." The court says:

"The expression 'caused by an accident due to a condition or conditions of such occupation' is original in our Constitution and laws. We have not been able to find it in any of the Compensation or Liability Laws, or in any decision of a court, or in any text-book, and it therefore necessarily follows that it has not been defined or applied. It is evident that the accident must arise out of and also be inherent in the occupation itself; the condition or conditions that produce the accident must inhere in the occupation. If the occupation is nonhazardous, if the condition or conditions inherent therein are innocuous, the occupation and the employé therein are outside of the purview of the Constitution and likewise of the Liability Law."

Referring to the facts in that case, the court said:

"The danger of falling into the scale pit was not peculiar to appellee in his occupation of bill clerk. It was a danger to which persons not employés of appellant were exposed as much as those engaged in the service of appellant. Appellee shows by his complaint and by the testimony of himself and others that the scale pit into which he fell was 'along the route usually traveled by himself and others having business in and about defendant's freight depot.' This being so, it was not a risk or hazard peculiar to his work, but one 'common to the neighborhood.' In re-McNicol, 215 Mass. 497, L. R. A. 1916A, 306, 102 N. E. 697."

Before reaching the question of liability of the defendant for the damage to the plaintiff caused by his fall into the scale pit, the court had determined that the plaintiff as a bill clerk was not engaged "at manual and mechanical labor," as provided in section 3 of the act, and for that reason was not entitled to recover. But in our opinion this fact does not materially lessen the value of this part of the opinion as an authority of that court upon this question.

"Where at the time of the injury the employé is engaged in a voluntary act, not accepted by, or known to, his employer, and outside the duties for which he is employed, the injury cannot be said to be in the course of the employment." Workmen's Compensation Act, Corpus Juris, p. 82.

[3] We conclude that the evidence on the part of the plaintiff was not sufficient to establish a cause of action against the defendant under the statute, and that for that reason the court should have granted defendant's motion for an instructed verdict for the defendant. We are also of the opinion that the defendant was entitled to the same instruction at the close of the case.

The judgment is accordingly reversed, with direction to enter judgment in favor of the defendant.

### On Rehearing.

In a petition for rehearing the copy of a recent decision of the Supreme Court of Arizona in Consolidated Arizona Smelting Co. v. John Edich, 195 Pac. ——, not yet [officially] reported, is submitted, with the statement that the doctrine enunciated by that court in Arizona Eastern Railroad Co. v. Matthews, 20 Ariz. 282, 180 Pac. 159, referred to in our opinion as an authority, has been overruled by the later case. Upon an examination of the opinion in that case, it appears that the holding in the Matthews Case that there can be no recovery "under the Employers' Liability Act for an injury resulting from an accident not due to risk or hazard inherent in the occupation" has been modified; the court holding in the later case that—

"An employé engaged in work in one of the hazardous occupations enumerated in the statute may recover for any accident occurring in the ordinary course of events during his work, the only other essentials being that the accident must be due to a condition or conditions of his employment, and not brought about by his sole negligence or fault."

In our former opinion, we referred to the opinion in the Matthews Case mainly with reference to that feature of the case wherein it appeared that plaintiff, a bill clerk employed in defendant's freight of-

fice had fallen into a scale pit that was being constructed by the defendant along the route usually traveled by himself and others having business in and about defendant's freight depot. The court held that, before an employé may recover for injury under the act, it must have occurred while he was at work in his occupation, and it must have been occasioned by a risk or danger "inherent in the occupation." In the later decision the court holds that the clause "inherent in the occupation" is misleading in the relation in which it was used in the prior case. The court says:

"The condition or conditions that caused the accident resulting in injury or death may be inherent in the occupation, or they may arise from the manner in which the business is carried on. The conditions of the occupation in which the employé does his work involve not only the place he works, but the tools with which he works, the one as much as the other."

The plaintiff in this last case had been injured while breaking rock with a hammer. While at work the head of the hammer flew off the handle and struck his right foot, breaking the toe. The approximate cause of the accident was the negligence of the defendant in furnishing plaintiff with a defective hammer to do his work. It will be observed that the plaintiff was at work in the mine at the time of the accident, and was using a tool furnished by the defendant. The distinction between that case and the present case is that the deceased in the present case was not at work, either in or about the mine, at the time of the accident, and was not using any tool or implement furnished by the defendant. The modification of the opinion of the Supreme Court of Arizona in the Matthews Case does not, therefore, affect the question involved in this case.

Rehearing denied.