No. 25,891.

Steve Fangmeier, *Appellee*, v. The Missouri Pacific Railroad Company, *Appellant*.

### SYLLABUS BY THE COURT.

Master and Servant—*Liability for Injury to Servant—Assumption of Risk.* The proceedings considered, and *held*, a flue borer did not assume the risk of injury from hot particles blown back upon him while cleaning the flues of an engine upon which he had been ordered to work before it was allowed to cool.

Appeal from Montgomery district court; Joseph W. Holdren, judge. Opinion filed June 6, 1925. Affirmed.

*W. P. Waggener, J. M. Challiss,* both of Atchison, and *S. H. Piper,* of Independence, for the appellant.

*Charles D. Ise* and *A. A. Baker,* both of Coffeyville, for the appellee.

The opinion of the court was delivered by

Burch, J.: The action was one by a flue borer in defendant's shops at Coffeyville, to recover damages for personal injury sustained when a hot particle was blown back as he was cleaning a flue in an engine, and struck his eyeball. The verdict and judgment were for plaintiff, and defendant appeals.

At a former trial a demurrer to plaintiff's evidence was sustained. On appeal, the judgment in defendant's favor was reversed and a new trial was ordered. (*Fangmeier v. Railroad Co.,* 115 Kan. 496, 223 Pac. 310.) The case now presented is so different from the one previously considered that it is necessary to make a statement of the facts.

Plaintiff had been a flue borer for two weeks, and in the regular course of his work on the night of the accident he bored about seven engines before he was hurt. Formerly, a helper went ahead of the flue borer to clean off the crown sheet, the flue sheet and the grates. The flue borer followed, and first bored and then blew out the flues. Plaintiff had been a helper for six months before he became a flue borer. At the time he was injured, helpers had been dispensed with and flue borers did their own cleaning preparatory to boring the flues. Under the former practice the helper and flue borer did not work on the same engine at the same time, and the fact that plaintiff acted as his own helper did not contribute in any way to his injury.

The accident occurred while plaintiff was working on the engine of defendant's train, "The Rainbow Special," running between Little Rock, Ark., and Kansas City, Mo. The engine arrived at 9:30 in the evening. It was taken to the cinder pit, and the fire was removed about ten o'clock. It was left outside the shop until about 11:30, when it was brought in. The flues of all engines are bored after each run, and the foreman testified to the routine method of indicating engines upon which flue borers are to work. There is a board in the shop on which the foreman writes the number of engine and the number of train and its time. The flue borer sees the time trains are to go out and works accordingly. The foreman said flue borers know their duties and are not supposed to work on an engine until it cools. Witnesses for plaintiff made clear the reason for waiting. It is not possible to do good work when the engine is very hot. Hot engines are bored when there is a rush, and it is the business of a flue borer to bore hot engines as well as cool ones, but it is not possible to get as close to the flues when the engine is hot as it is when the engine is cool, and the closer one can get the better work he can do.

Plaintiff testified the foreman came to him personally when the Rainbow Special engine came into the shop and ordered him to bore its flues at once. Although plaintiff had not yet seen the engine, he said, "It is too hot." The foreman retorted, "Go ahead and work that engine right now." No reason for this arbitrary conduct on the part of the foreman is suggested. There was no emergency. The engine did not leave until 6:40 the next morning, and there was plenty of time for it to cool. There was no shortage of help, and no reason for selecting plaintiff to work upon the engine as soon as it came in, because he had only time to do part of the work before twelve o'clock midnight, when a new shift came on, and he quit work and went home. As a matter of fact, three-fourths of the flues were bored and all of them were blown out after he went home. Nevertheless, on the basis of this testimony, the jury returned the following findings of fact:

"Q. If you find for plaintiff, what, if any, negligence do you find against the defendant? A. For not letting engine cool off.

"Q. If you find negligence against the defendant, then state what servant, agent or employee of the defendant was guilty of such negligence. A. Mr. Rail, foreman."

The trial court has approved these findings. Although the fore-

man denied doing so, there is a remote possibility that he gave this strange order, and this court cannot settle the question of veracity.

Plaintiff went into the fire box, which was about six feet in height, cleaned the crown sheet, flue sheet and grates, and removed a portion of the arch. The base of the arch, which consists of fire-brick tablets laid on large pipes forming part of the construction of the engine, is about one foot back of the flue sheet. From this base the arch curves outward about four or four and one-half feet and upward about the same distance. It is necessary to remove it in order to reach the flues with the boring and blowing apparatus. After taking down part of the arch, plaintiff bored some of the flues. Boring is done by an augur, which loosens the incrustation inside the flues. Most of the incrustation is at the fire-box end of the flues, and the borer is able to tell by operation of the tool when he has bored far enough into a flue. Plaintiff loosened all the incrustation in the flues he bored the night of the accident. Usually all the flues are bored before blowing out the loosened material. In this instance plaintiff bored one-fourth of the entire number. He then applied his blowing device to a flue. The blowing device consists of a nozzle about 2½ or 3 feet long, which is inserted into the flues, a shield about six inches in diameter at the base of the nozzle, and a valve a few inches behind the shield, which releases compressed air in a hose to which the nozzle is attached. The flue borer inserts the nozzle until the shield is against the flue sheet, and turns on the air slowly, until he ascertains if the air will go through the flue and blow out the loose material inside of it at the front of the engine. Finding that the air does go through, he turns it on so that it operates with full force. A flue may be stopped up at the front end of the boiler, and if the air does not go through, loose material inside the flue will be blown back. The shield performs the function which its name indicates, and, by turning it, the particles which are blown back may be deflected to one side. It is, however, only partial protection when a strong blast of air is turned into an obstructed flue, and when the shield is not against the flue sheet, particles may be blown back against the flue borer.

Plaintiff was injured while attempting to blow out the first flue into which he inserted the blower. He said, "A hot spark of fire came flying back and blew in my eye and burned it." He said the flues were surrounded by the water in the boiler, and were not red hot, but that fire came flying out. He further testified as follows:

"The soot always burns; sometimes burns for hours. I have seen the soot continue to burn in a locomotive boiler, when the doors are open and the fire box is open, for hours after the fire has been knocked out."

Plaintiff testified it was always proper practice to turn the air on a little at a time to see if the air would go through, and the jury found it was his duty to ascertain whether a flue was stopped up before turning on a full head of air. Plaintiff testified that in this instance he turned the air on slowly at first, and then "turned it loose." As indicated above, plaintiff testified he bored out the incrustation at the fire-box end of the flues, so there was nothing there to prevent the blast of air from going through. He testified he thought the flue was not stopped up, but said "it was anyway," and he testified further as follows:

"Q. Were you satisfied it was not stopped up? A. Well, I thought it was not stopped up.

"Q. You now know it was stopped up? A. Yes, sir.

"Q. You turned the air in there with a full head, a full volume, and it could not go through, and consequently it came back? A. Yes, sir.

"Q. Whereas, if you had tested the flue as you say you should have done, you would have ascertained that the flue was stopped up, and you would not have tried to blow the flue; that is correct, isn't it? A. Yes, sir."

Notwithstanding this testimony, given by the single witness who knew the fact, the jury returned the following findings of fact:

"Q. Would the stoppage of the flue at the opposite end cause particles to be blown against the flue borer when the air was turned on? A. Yes.

"Q. Was the flue upon which the plaintiff was working stopped up at the opposite end? A. Unknown."

Plaintiff testified that when the air is turned on the shield ought to lie flat against the flue sheet, so that the heat (hot particles) cannot get out (be blown back). The flue borer is supposed to stand by or on the base of the arch and hold the shield up against the flue sheet, and in doing so his hands will be four or five inches from the flue sheet. In this instance plaintiff had a light, and it was light in the fire box. He thought he had the shield up against the flue sheet, but he did not know. On this testimony the jury returned the following findings:

"Q. If the shield was not up against the flue sheet when the air was turned on, would particles be blown back against the flue borer? A. Yes.

"Q. Did the plaintiff know, when he turned on the air, that the shield was not up against the flue sheet? A. No.

"Q. Was the shield against the flue sheet when the plaintiff turned on the air? A. Unknown."

Plaintiff's explanation for not knowing positively if he had the shield against the flue sheet was that the engine was so hot he could not get to the flue sheet; the arch was too hot; if he had gotten on the arch it would have burned his shoes; the fire box was so hot it set his heavy canvas apron on fire and he had to tear the apron off; and he had not in his experience bored, or seen bored, an engine which was so hot as the Rainbow Special engine was that night. The jury found there was nothing he should have done or could have done to prevent the accident.

Defendant says plaintiff assumed risk of the particular injury which he suffered. The case is governed by federal law, and the fact that the risk encountered was created by negligence of the foreman did not of itself bar the defense of assumed risk. In the case of *Lively v. Railway Co.*, 115 Kan. 784, 225 Pac. 103, may be found quotations from the opinions in the leading cases of *Burke v. Union Coal & Coke Co.*, 157 Fed. 178, 84 C. C. A. 626, and *Seaboard Air Line v. Horton*, 233 U. S. 492, which establish the law on the subject. In the *Arizona Employers' Liability Cases*, 250 U. S. 400, the opinion reads:

"The rule existing in the absence of statute, as usually enunciated, is that all consequences of risks inherent in the occupation and normally incident to it are assumed by the employee and afford no ground of action by him or those claiming under him, in the absence of negligence by the employer; and even risks arising from or increased by the failure of the employer to take the care that he ought to take for the employee's safety are assumed by the latter if he is aware of them, or if they are so obvious that any ordinarily prudent person under the circumstances could not fail to observe and appreciate them. . . . (*Seaboard Air Line Ry. v. Horton*, 233 U. S. 492, 504, 505; 239 U. S. 595, 598, 599; and cases cited.)" (p. 421.)

What was plaintiff's situation when he was injured? He knew the engine was hot when he was ordered into it, and he protested against the foreman's order because the engine was too hot. Assuming he then had in mind nothing but the discomfort of working in the intense heat of the fire box, he had ample time and opportunity to comprehend and reflect upon the danger attending the work he was required to do. He cleaned off the crown sheet, the flue sheet and the grates, removed part of the arch, and bored one-fourth of the flues. He found the arch was so hot he could not stand against or upon it, and his apron took fire. While he had been a flue borer but two weeks, and had never cleaned the flues of an engine so hot as this one, he had no reason to believe the incrustation which he

loosened inside the flues of this engine would be cool, and he knew there might be fire in the flues, even if the engine were cool. He said he knew soot would burn for hours. Therefore, whether the engine were hot or cool, hot particles might fly back. He knew that when he attempted to use the blower the shield ought to lie flat against the flue sheet, and that he ought to turn on the air slowly to keep heated matter from being blown back; and if the shield were against the flue plate, the shield would not protect him if a full head of air were turned into an obstructed flue. He did turn on the air slowly, until he thought the flue was not obstructed, but the excessive heat prevented him from getting close enough to the flue plate to be sure he had the shield against it. All this being true, did plaintiff assume the risk of injury in case hot particles were blown back against him?

The court is of the opinion plaintiff did not assume the risk. Because of the excessive heat in which he was required to work, he could not properly use the blower. What the actual conditions were when he turned on the full blast of air he did not know. He thought the flue was unobstructed, but he could not tell whether the shield was against the flue plate. The engine was not needed until morning, there was no occasion for imposing on plaintiff emergency hazards, and his actual situation, whatever it was, was due to defendant's negligence. The same negligence prevented him from knowing the true conditions, and knowledge of the conditions was essential to assumption of risk from them.

Other assignments of error have been considered. Liability of defendant depends on whether plaintiff assumed the risk. The court is satisfied it is in possession of all the facts bearing upon that subject, and no good purpose would be subserved by requiring them to be canvassed a third time. Therefore, discussion of the case need not be extended further.

The judgment of the district court is affirmed.

BURCH, MARSHALL and DAWSON, JJ., dissenting.